UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS ROSA, JR.,
Petitioner

O4cv10174NG

v.

MICHAEL T. MALONEY
Respondent

## MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. 2254

## PROCEDURAL HISTORY

On February 11, 1986, a Grand Jury sitting in Suffolk County indicted the defendant for the following offenses: (1) Kidnapping [indictment no.57351]; (2) First degree murder [indictment no. 057352]; and (3) Aggravated rape [indictment no. 057353]. The defendant's first trial ended in a mistrial on October 9, 1986 when the jury failed to reach a unanimous verdict. His second trial resulted in convictions on November 25, 1986, which were reversed by the Supreme Judicial Court on March 9, 1992. *Commonwealth* v. *Rosa*, 412 Mass. 147 (1992).

Following a third trial, a jury convicted the defendant of first-degree murder and kidnapping. The jury acquitted the defendant on the aggravated rape charge. The trial judge (Banks, J.) sentenced the defendant to a term of life imprisonment at Massachusetts Correctional Institution at Cedar Junction on the murder conviction with a concurrent term of nine to ten years on the kidnapping indictment [Tr.VI:16]. [1] The defendant filed a

---

[1] The following abbreviations will be used throughout this memorandum:
[Trial Transcript:Volume:Page Number]; [Tr.:Volume:Page Number];

timely notice of appeal. The Supreme Judicial Court affirmed the conviction.

*Commonwealth* v. *Rosa*, 422 Mass. 18 (1996).   On May 24, 1999 the Petitioner filed a

"pro-se" motion to dismiss, strike or set aside the prior conviction.   On September 7,

1999, the defendant filed a pro-se motion for release from unlawful restraint due to the

loss of potentially exculpatory evidence and trial counsels ineffective assistance of

counsel for failing to object to the loss of this evidence. The defendant filed a motion for

release from unlawful restraint due to ineffective assistance of counsel and prosecutorial

negligence pursuant to Mass. R. Crim. P. 30 (A) with a supporting affidavit; a motion for

appointment of counsel; a motion for a new trial with supporting affidavit. The Court

never acted on the pro-se motions. On April 17, 2002 undersigned counsel filed an

amended motion for a new trial with supporting affidavits and memorandum of law. The

defendant also requested a hearing on these issues. On February 3, 2003 the defendant

filed a supplemental memorandum. On January 31, 2003 the Superior Court [Spurlock,

J.] denied the defendant's motion without a hearing after "review" of the defendant and

the Commonwealth's memorandum. On February 3, 2003 [the same day that the Court

received the defendant's supplemental materials] the Court held that "after review" the

ruling stood.

The defendant petitioned the Single Justice of the Massachusetts Supreme Judicial

court for leave to appeal the denial of the defendant's motions pursuant to M.G.L.C. 278

§33E. On October 17, 2003 the Single Justice denied the motion.

## FACTS

The Supreme Judicial Court found the following facts pursuant to *Commonwealth v.*

*Rosa,* 422 Mass. 18 (1996):

2

Sometime around midnight on the night on December 6,1985, Gwendolyn Taylor, in the company of one Charles Ferguson, left the home of Ferguson's aunt in the Dorchester section of Boston. Taylor lived a short distance away on Talbot Avenue. The couple proceeded down Talbot Avenue. At a point within 150 feet of Taylor's apartment the two parted ways. Ferguson immediately ran back to his aunt's house, where he then telephoned Taylor's apartment, to see if she had made it home safely.

Ferguson's stepsister, Charita Offley, shared the apartment with Taylor. She answered the telephone, stating that Taylor had not yet arrived home. Ferguson called again five minutes later, and was again told that Taylor had not returned. Ferguson called a third and fourth time, and at that point Charita went onto the porch of the third-floor apartment to look for Taylor on the street. She saw Taylor sitting on the stairs to the apartment building's entrance, with a man standing in front of her. Charita shouted to Taylor to come to the telephone. Taylor responded that she would call Ferguson back. When Charita told Ferguson this, Ferguson demanded to speak to Taylor. Charita called out to Taylor again, and Taylor repeated that she would call Ferguson back. A few minutes later the doorbell to Taylor and Charita's apartment rang. Charita went to the porch and saw Taylor had returned to the entrance of the building. Taylor saw Charita on the porch, and asked her to come downstairs. Arriving in the entranceway, Charita saw a man standing beside Taylor, holding what Charita testified was "a shiny object" near Taylor's shoulder. Charita described Taylor as visibly frightened, and Taylor asked Charita if she had $100. Charita went back upstairs to the apartment to see if their other two roommates had any money. The man at Taylor's side shouted after Charita not to call the police, and Taylor told Charita that "he's not kidding."

Charita woke her other two roommates, Kevin Neal and "Tammy" Offley, and reported that Taylor was in trouble. All three went on the porch and saw that Taylor and the man had moved to the other side of Talbot Avenue, with the man holding Taylor close to him with his arm around her neck. Taylor, in a "hysterical" tone, again asked for $100. Neal stated that he did not have that much money. The man and Taylor then walked about in a nearby park and basketball court, finally proceeding down an alley.

Neal rushed down the stairs while Charita called the police. Shortly thereafter, the Boston police arrived. The three roommates related events to two police officers, and the officer's drove down the alley with lights on to search for Taylor. They then waited for one-half hour in silence to listen for any sounds. These searches were in vain. The next morning an employee of a nearby automobile body shop arrived at work. He noticed that the door of one of the motor vehicles awaiting repair was open, and he could see a limp human arm hanging out the door. Walking up to the vehicle he saw a woman's body, naked, with a cloth wrapped around her neck. He called the police, who subsequently identified the victim as Gwendolyn Taylor.

At trial, two witnesses identified the defendant as the man with Taylor and the person who walked off with Taylor the last time she was seen alive. Charita Offley identified Rosa at trial, stating she saw his face when she, Taylor, and the man were in the entryway of the apartment building. A second witness, Sharon Areh, testified that she had seen

Rosa holding Taylor at the entrance to the apartment building. Areh had been walking home with a companion at the time.[2] She stated at trial that she recognized the man holding Taylor as Rosa. Areh had seen him on several occasions previously because Rosa lived upstairs from Areh's cousin. ***Physical evidence corroborated the identification of the two witnesses***. Police detectives had collected physical evidence at the scene of the crime, including blood samples. The results of blood typing of those samples were consistent with the government's theory that Rosa committed the crime.[3] Several hairs were found on Taylor's clothing, although none could be matched to anything that would implicate Rosa. ***The other major piece of evidence was a brown coat found at Rosa's apartment. Two identification witnesses, Charita and Tammy Offley, had stated that the man with Taylor had been wearing a brown coat and that the coat found at Rosa's was the same coat they had seen. (Emphasis added).***

To prove the identification of the perpetrator, the Commonwealth maintained

that a stain found on a jacket confiscated from the defendant's house, purported to have

been worn by the perpetrator, was consistent with coming from the victim [Tr.II:13-14].

Contrary to the Commonwealth's premise in all of the defendant's trials, post-conviction

DNA[4] testing unequivocally established that the stain on the jacket was not from the

victim.  This testing was not available at the time of the defendant's previous trials and

appeals.

Additionally, two items tested positive for the presence of blood however, no

further testing was done.  These items were a sweater worn by the victim that was

identified as being "used as ligature" and the pants worn by the victim. [Exhibit:4].  The

blood on the pants is particularly significant since hairs were found on them that were

dissimilar to Mr. Rosa and the victim.  Post-conviction investigation determined that if

blood were in fact present on these items and if these items were stored properly, it is

possible that results could have been obtained using polymerase chain reaction technique

---

[2] The police never questioned or located this "companion" and Areh never gave his full name.

[3] These blood groupings only provided a general identifying markers.

[4] DNA is short for deoxyribonucleic acid that is the genetic material present in each of the nucleated cells of our body.

(PCR) based tandem repeat (STR) testing. The first multiplex STR kits became available

in 1996, after the defendant's trials. [Exhibit 4].

In preparation for filing the defendant's motion, undersigned counsel attempted to locate

these items and they were never produced after the representative from the District

Attorney's Office acknowledged receipt of them on October 17, 1989 [Ex.:5]. These

items could have been tested with the other items forwarded to Cellmark in preparation

for the defendant's new trial motion. Since the testing was not available at the time of the

defendant's appeal the Commonwealth's failure to preserve this evidence deprived the

defendant of a fair trial and the opportunity to produce evidence favorable to his case.

## ARGUMENT

**PETITIONER'S CONVICTIONS WERE OBTAINED IN VIOLATION OF HIS FEDERAL RIGHTS TO PRESENT WITNESSES IN HIS FAVOR AS PROVIDED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; IN VIOLATION OF HIS RIGHTS TO A FAIR TRIAL AND IN VIOLATION OF HIS RIGHTS TO DUE PROCESS OF LAW AS PROVIDED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION SINCE NEWLY DISCOVERED DNA EVIDENCE WILL PROBABLY RESULT IN AN ACQUITTAL UPON RETRIAL OF THE DEFENDANT**

To prove the identification of the perpetrator in this case, the Commonwealth

maintained that a stain found on a jacket confiscated from the Petitioner's house,

purported to have been worn by the perpetrator, was consistent with coming from the

victim. The Commonwealth emphasized this evidence in it's opening, through direct

testimony and during closing argument. The source of the stain was a critical piece of

evidence for the Commonwealth to connect the confiscated coat to the victim and

ultimately to the crime. Based on the evidence elicited during all three trials, the jury was

left with the impression that the victim was the source of the stain on the lapel of the

brown coat. Post-conviction DNA testing, which was not available at the time of the defendant's trial eliminated the victim as the source of the stain. [The specific testing was validated in February 1999]. These results are critical since the main issue in the case was the identification of the perpetrator. However, there were no eyewitnesses to the killing. The case against the Petitioner was circumstantial and the newly discovered evidence established that one of the crucial inferences [the victim was the source of the stain on the lapel] that the Commonwealth and the Supreme Judicial Court relied on was not true. The unavailability of the results of DNA testing on the stain from the brown coat concluding that the victim was not the source of the sample at the time of the defendant's trial deprived him of his right to "have compulsory process for obtaining witnesses in his favor" as provided by the Sixth Amendment to the United States Constitution; denied the defendant of the opportunity to produce all proofs that may be favorable to him; and deprived the defendant of a fair trial and of the due process of law as required by the Fifth Amendment to the United States Constitution. *Massachusetts Declaration of Rights, Article XII; U.S.C.A. 5, U.S.C.A. 6.* The federal constitution guarantees a criminal defendant a fair trial through the Fifth and Fourteenth Amendments. The basic elements of such rights are largely defined through the several provision of the Sixth Amendment. See, *Caplin & Drysdale v. United States*, 491 U.S. 617 (1989); *Commonwealth v. Chappee*, 397 Mass. 508, 516-518 (1986); *Taylor v. Illinois*, 484 U.S. 400 (1988).

A defendant seeking a new trial based on newly discovered evidence must show that: "(1) the evidence was unknown or unavailable to the defendant

at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant." *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980); see also *United States v. Colon-Munoz*, 318 F.3d 348, 358 (1st Cir. 2003). A motion for a new trial must be denied if the proponent fails to meet any one of these factors. *See United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 20 (1st Cir. 2001).

### 1-2. *The evidence was unknown or unavailable to the defendant at the time of trial/Failure to learn of the evidence was not due to lack of diligence by the defendant*

The results of the testing establishing that the victim was not the source of the stain on the coat taken from the petitioner's house during the execution of a search warrant was unknown and unavailable to the defendant at the time of all three of this trials.    During post-conviction investigation, Cellmark Diagnostics performed post-conviction DNA testing on the cutting from the brown coat [Ex.:1]. Kathryn Colombo was the analyst assigned to perform the testing.  Colombo explains that DNA, short for deoxyribonucleic acid, is the genetic material present in each of the nucleated cells of our body [Ex.:1].  DNA, sometimes called the blueprint of life, encodes all of the information required for us to function as humans [Ex:1][5].  The vast majority of the DNA present in humans is the same from one person to another; however, there are small regions of the DNA that differ from one individual to another (with the exception of identical twins). DNA identification testing focuses on these regions that are know to differ amongst individuals in the human population.    With this testing procedure it is possible to determine the DNA types of an individual at several of these regions, thereby creating a

---

[5] Ms. Colombo's Curriculum Vitae is attached and marked as Exhibit 1A.

DNA profile for that individual. The DNA profile from a known individual may be compared to the DNA profile obtained from biological samples of unknown origin collected at a crime scene. If the DNA profile from a known individual is different from the DNA profile from the evidence samples, that known individual is excluded as the source of the sample; in other words, that individual cannot be the source of the DNA sample. If however, the DNA profile from a known individual is present in the DNA profile from an evidence sample, that known individual cannot be excluded as a source and is therefore included as a possible source of the DNA from that evidence sample [Ex:1].

Colombo tested the cutting from the brown coat and determined, "[T]he DNA obtained from the brown coat cutting is from a male. Gwendolyn Taylor [the victim] is excluded as the source of the DNA obtained from this sample" [Ex.:1]. Colombo maintains the following relative to the DNA procedure followed on the brown coat and the stained cloth in envelope labeled "Gwendolyn Taylor":

> Nine unique genetic locations were examined. The quality controls performed with the case samples worked correctly. The conclusions of the testing are as follows: The DNA obtained from the brown coat is from a male and Gwendolyn Taylor is excluded as the source of the DNA obtained from the brown coat [Ex.:1].

The defendant was indicted in 1986. The defendant's first and second trial took place in 1986. The defendant's third trial took place in February and March of 1993. Colombo explains that the specific test used in the analysis of these items is the AmpF/STR Profiler Plus TM test. The test utilizes fluorescent detection methods in order to examine short tandem repeat (STR) markers. Fluorescent STR markers were first described in 1991, and the first multiplex STR kits became available in 1996.

Fluorescent multiplex STR kits (including the Profiler Plus TM kit) were validated by numerous labs in 1999 and during this general time frame, the FBI and other agencies converted to these methods. Cellmark began using this testing system in February of 1999 [Ex.:1]. Where a new scientific test is developed after a conviction, a defendant may be entitled to a new trial. *Commonwealth v. Meggs*, 30 Mass. App. Ct. 111 (1991). ***In the Suffolk Superior Court, the Commonwealth did not challenge the claim that the DNA evidence qualified as newly discovered evidence. (Emphasis added).*** The issue is new since the defendant was previously not in a posture to bring forward this claim. *Commonwealth v. Francis*, 411 Mass. 579, 584 (1992). Similarly, the evidence was unknown or unavailable to the defendant at the time of trial and the failure to learn of the evidence was not due to lack of diligence by the defendant. *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980); see also *United States v. Colon-Munoz*, 318 F.3d 348, 358 (1st Cir. 2003).

### 3-4. The evidence is material, and not merely cumulative or impeaching and it will probably result in an acquittal upon retrial of the defendant

This claim is material since the source of the stain was a critical piece of evidence for the Commonwealth to connect the confiscated coat to the victim and ultimately the crime. *Id.* For example, to prove the identification of the perpetrator, the Commonwealth maintained that a stain found on the jacket confiscated from the defendant's house, purported to have been worn by the perpetrator, was consistent with coming from the victim [Tr.II:13-14].

In his opening statement the prosecutor stated:

> You will hear testimony from the forensic chemist, Mr. Stanley Bogdan, who will testify as to certain chemical tests that he performed on the jacket that ***the***

> *Commonwealth alleges the defendant wore on the night of the kidnapping, rape and murder.*
>
> As a result of certain forensic tests you will hear evidence indicating the particular blood grouping type of the victim and you will hear the blood grouping type this defendant. *You will hear testimony to the effect that certain stains that were found on the defendant's jacket had blood grouping consistencies with the victim in the case and blood grouping inconsistencies with the defendant [Tr.II: 13-14] (emphasis added).*

The prosecutor concluded his opening statement as follows:

> . . . Based upon the testimony of the chemist and the medical examiner and all of that, the Commonwealth will prove to you, that Thomas Rosa kidnapped, raped and murdered Gwendolyn Taylor. . . [Tr.II:16].

During cross-examination the Commonwealth's chemist testified as follows:

> **Defense Attorney:** And the theory of how that stain got there is that the man is supposed to have picked up Ms. Taylor and the mucous from her mouth got on her – got on the coat. That's the theory' isn't that correct?
>
> **Witness:** I suppose so.
>
> **Defense Attorney:** That's what you testified to in the last trial.
>
> **Witness:** . . . . Yes . . . . Yes. That's what I'm saying now [Tr.IV:83-84].

Additionally, during his closing argument the prosecutor also alerted the jury to the stain

on the jacket and stated:

> ". . . And the stains on the jacket were consistent with the "O" blood grouping status, which is consistent with Gwendolyn Taylor and not consistent with the defendant. . . . Again, you take that evidence in conjunction with the total case. . . [Tr.V:79-80].

The Supreme Judicial Court also relied on the results of the scientific testing in affirming

the defendant's conviction. The Court held the following:

Physical evidence corroborated the identification of the two witnesses. Police detectives had collected physical evidence at the scene of the crime, including blood samples. The results of blood typing of those samples were consistent with the government's theory that Rosa committed the crime. . . *The other major piece of evidence was a brown coat*

*found at Rosa's apartment* . . . *Commonwealth v. Rosa*, 422 Mass. at 21. (Emphasis added).

The source of the stain was a critical piece of evidence for the Commonwealth to connect the confiscated coat to the victim and ultimately to the crime. Undoubtedly, the jury was left with the impression that Gwendolyn Taylor [the victim] was the source of the stain on the lapel of the brown coat. The main issue in the case was the identification of the perpetrator. However, there were no eyewitnesses to the killing of Gwendolyn Taylor. The case against Mr. Rosa, which seemed to improve at every hearing, was circumstantial. For example, the Supreme Judicial Court relied on Charita Offley's testimony in affirming the conviction by holding, "Charita Offley identified Rosa at trial, stating she saw his face when she, Taylor, and the man were in the entryway of the apartment building." *Commonwealth v. Rosa*, 422 Mass. at 21. During the defendant's third trial,[6] Offley testified that while she was standing in the hallway with Taylor and a man she [Offley] got a look at the man and had "no doubt" that the man was Mr. Rosa [Tr.II:58, 61-62]. However, seven years earlier at the motion to suppress the identification of the defendant, Offley testified that she could not remember the shape of the "man's" face [M.S.:16]. Additionally, relative to the man in the hallway with Taylor, at the motion hearing Offley testified, "He was standing right behind Gwen so I couldn't see his face. . . [M.S.:27]. Thus, evaluating Offley's testimony in the entire context of the court proceedings substantially weakens the Commonwealth's case [Tr.IV:15-16].

Without the evidence that the stain on the coat was from the victim, the Commonwealth's case is substantially weaker. The weaknesses are illustrated by the

---

[6]Charita Offley offered this testimony during the third trial on February 26, 1993. Her referenced testimony from the motion to suppress the identification took place on December 19, 1985. Reference to this hearing is [M.S.:Page Number].

inconsistencies in the descriptions given of the perpetrator and that Cherita Offley's initial description of the perpetrator did not coincide with Mr. Rosa's appearance. Offley described the man with Taylor as being Hispanic, light-skinned, 5'9'' in height, weighing about 150 pounds, of slim build, and wearing black pants and a tan coat. [Tr.II: 120-121, 123, 142]; [Tr.III:13, 15-20, 28]. Offley did not mention a mustache or any sort of beard or goatee [Tr.II:123]; [Tr.III:18], and at the time of trial she did not remember whether the man she saw in the hallway had a mustache or a beard [Tr.II:144]. However, on the photograph of the defendant that she picked out later that morning [Tr.II:70-72], he is depicted with a mustache and some sort of slight beard or goatee [Tr.II:142-143]. The descriptive data entered on Rosa's booking sheet after his arrest in this case gave his age as twenty four, his height as 5'8", his weight as 190 pounds, and his built as medium [Tr.III:211-212].

After Offley selected the defendant's picture, her description given to Sgt. Horsley of the perpetrator changed. At this time, she described the suspect "as a light-skinned Hispanic male, 5 feet 8, 170 pounds, moustache which stopped at the upper lip, fine hair. [Tr.III:184, 219-220]. Offley explained that the perpetrator could have had a tooth missing, upper right, or a possible space between the teeth on the right upper side. Mr. Rosa was not missing a tooth. [Tr.III:216]. There was nothing about "missing teeth" in the descriptive data entered after his arrest [Tr.III:212].

Offley did not have a good opportunity to observe the man with Taylor. Offley described that when she went downstairs there was no light in the hallway and there was no light from the street coming in [Tr.II:99]. While the pair "were walking down the street hand in hand" Offley did not see the man's face. [Tr.III:109]. Offley did not see

his face when they were behind the Lee School or when she was speaking with Taylor from the window [Tr.III:110]. During this trial, Offley stated that the man was beside Taylor. However, in an earlier hearing she testified that the man was behind Taylor and she could not see his face. [Tr.II:100-103]. This testimony was offered seven years earlier during the motion to suppress the identification that took place on December 19, 1985.

Offley's testimony about the circumstances surrounding the photo array changed from five weeks after the incident to the third trial. Five weeks after the incident, Offley testified that she selected a photograph and stated, "This looks like him." [Tr.III:132]. (This was not a photograph of the defendant). The officer told Offley to keep looking and she stopped at a second photograph of the same person [Tr.III:133]. Offley did not know that it was a picture of the same person until the officer told her. [Tr.III:134]. However, during the third trial her testimony changed and she qualified her selection of the first photograph to "it looks like him but there's something about the eyes." [Tr.III:132]. Mr. Rosa's picture was the third one she selected. [Tr.III:136].

The Commonwealth's reliance on the presence of saliva on the brown coat bolstered it's case and the fact is significant in view of the discrepancies between the description of the perpetrator between the witnesses, the change in Offley's testimony relative to the perpetrator's appearance and the circumstances surrounding the identification of the defendant as the perpetrator, the lack of motive on the defendant's part for committing this crime and the fact that hairs on Taylor's bra and white slacks were dissimilar to Mr. Rosa. [Tr.IV:70-73]. Additionally, two witness testified that on

13

the night of the incident, he gave the Petitioner a ride home at approximately 10:30 and saw him to into his building [Tr.V:19, 23].

Relative to the hairs, Bogdan initially wrote that the pubic hair collection lifter had three hairs on it. One was a Negroid pubic hair that was dissimilar to Taylor or Rosa. The others were two fragments or Negroid hair unsuitable for comparison. However, he "updated" his original findings to state that there were three hairs on the lifter consistent with two pubic hairs and a fragment of Negroid origin. The two pubic hairs were found to be similar to Taylor's pubic hair and the fragment was unsuitable for comparison purposes [Tr.IV:86]. There were also several hairs collected from the bra that were identified as Negroid head hairs. There were no hairs similar to those of the Petitoner and one of the hairs was similar to the victim's hair. [Tr.IV:70-71]. There were also head hairs collected from Taylor's white slacks. The head hairs were dissimilar to the Petitioner and Taylor. [Tr.IV:72-73]. No fibers from the Petitioner's clothes were found on Mr. Taylor's clothing [Tr.IV:74]. There were no pubic hairs of Ms. Taylor on any or the Petitioner's clothing [Tr.IV:76].

The fact that the Commonwealth emphasized this evidence is illustrated by the fact that the prosecutor referred to the evidence in the opening, called a witness to testify to the information and argued the evidence during closing argument. The Assistant District Attorney emphasized not only the coat but also the fact that the stain on the coat was consistent with coming from the victim at all three of these stages during this trial. The fact that the saliva on the coat was consistent with coming from the victim undoubtedly played a rule in the jury's deliberations. The fact that jury considered this as evidence is illustrated by their following question to the trial judge, ". . . explain the types

14

of evidence . . . also proof beyond a reasonable doubt, and also, how are we to use the evidence?" [Tr.VI:3].    The impact of the false scientific evidence is particularly significant since the case against the Petitioner was circumstantial.

In addition to the evidence presented at the third trial, the stain on the coat was also a major piece of evidence during the first two of the defendant's trials. The effect of the results on all three trials must be evaluated particularly in view of the fact that the first jury failed to reach a unanimous verdict. For example, during the first trial there was a similar exchange between Bogdan and the prosecutor relative to the significance of the stain on the lapel of the coat. The following exchange occurred between Bogdan and the prosecutor:

**Prosecutor:** And, at some time, Sir, were her [victim's] epithelial cells found?

**Bogdan:** The extract of the stain on the right lapel, which was submitted to the medical examiner, and epithelial cells were detected in that extract.

**Prosecutor:** Were you able to group them?

**Bogdan:** A grouping of that extract, which I did, showed the presence of the H blood group substance.

**Prosecutor:** All right. What does the presence of an H blood group substance tell you?

**Bogdan:** It tells me that secretion came from a person who is a secretor Type O, . . .

**Prosecutor:** And, who is the O secretor [sic] in this case?

**Bogdan:** The victim in this case is an O secretor.

**Prosecutor:** So, you are finding an O secretor in the stain **on his coat? (Emphasis added).**

**Bogdan**: That is correct.

**Prosecutor:** Do you have an opinion, Mr. Bogdan, whether or not finding the O secretor on the coat is consistent or inconsistent with Gwendolyn Taylor?

**Bogdan:** Is consistent with.

**Prosecutor:** Do you have an opinion whether or not that the group O secretor status on that coat is consistent or inconsistent with the Defendant's blood group typing?

**Bogdan:** That is inconsistent with the Defendant's blood type. [Tr.1:V:65-67][7].

These findings were re-emphasized in the re-direct examination by the prosecutor:

**Prosecutor:** And, on the stains on the coat, your findings on the groupings of that?

**Bogdan:** I found the H blood group substance consistent with the origin type O secretor.

**Prosecutor:** And, who is the O secretor in this case?

**Bogdan:** Gwendolyn Taylor.

**Prosecutor:  And, that is on his coat? (Emphasis added).**

**Bogdan:** Yes.

**Prosecutor:** And, is that consistent with, including her blood grouping on that coat?

**Bogdan:** Yes.

**Prosecutor:** And, is it consistent with excluding his blood grouping on that coat?

**Prosecutor:** Yes. [Tr.1: V: 85-86].

Similarly, during the second trial, the stain on the lapel of the brown coat was emphasized during the prosecutor's opening, witness testimony (Stanley Bogdan testified to fact that the stain was consistent with coming from the victim and inconsistent with

---

[7] References to previous trial transcripts will be made as follows: [Trial number: volume number: page number].

coming from the defendant)[Tr.: 2:III: 162-163] and the prosecutor strenuously argued

the significance of the stain in his closing argument.

For example, during his opening statement the prosecutor stated the following:

> **Prosecutor:** " . . . Mr. Stanley Bogdan, . . . will tell you about certain tests that he did on that jacket, . . . . and he will tell you about certain tests he did no the defendant's jacket and he found what's known as epithelial cells. And, epithelial cells, that's a fancy way of talking about sweat glands, in a person's mouth and saliva, and he found saliva, or epithelial cells on the defendant's jacket and he did blood grouping tests on that and he will tell you that the blood and saliva on his jacket is not his and it's consistent with being her's. It excludes him and it is consistent with her. So, the chemical information in this case which ties the person and ***the blood grouping of the victim to the defendant is very important in the Commonwealth's case,*** . . ."[Tr.2:II:38-39] (emphasis added).

> During re-direct examination the following exchange occurred between

the prosecutor and Mr. Bogdan:

> **Prosecutor:** Mr. Bogdan, . . . . . sir, assume the following facts, if Gwendolyn Taylor's body was found with a large amount of mucus in her mouth, if she was lifted up and carried by a person wearing that jacket, do you have an opinion as to whether or not that would explain characteristics of her groupings in that stain on his jacket?

> **Mr. Bogdan:** Yes.

> **Prosecutor:** . . . . And, what is your opinion?

> **Mr. Bogdan:** That the stain could have come from her under the way you've described it. [Tr.2:III:178].

During the prosecutor's closing argument in the second trial the prosecutor argued the

following:

". . . And on the jacket, as a result of the epithelial cells, they found on his jacket blood

groupings which was consistent with her, to the exclusion of him." [Tr.2:V:73].

The prosecutor further argued the following relative to how the stain got on the brown

coat:

> ". . . . Isn't it consistent that after she was murdered and after she was raped she was carried down the alleyway and put in that car? And isn't that when he lifted her over his shoulder wearing that coat, that's when the epithelial cells, which match her and don't match him, ended up on his coat?" [Tr.2:V:75].

At the conclusion of his statement the prosecutor argued significance of the coat again by stating:

> ". . . And then again, look what the crime lab does with the coat. They found on the stains consistency with her status as the O secretor and it excludes him as a B secretor on his coat . . . . " [Tr.2:V:80].

Thus, similar to the third trial, if the post-conviction DNA testing was available eliminating Taylor as the source of the stain a major component of the Commonwealth's case would have been eliminated. In view of the fact that the first trial ended in a hung jury and the evidence was used in all three trials, the Court must look at the results of the newly discovered DNA evidence as it effects the outcome of all three trials. The erroneous evidence was stressed in all of the trials and was clearly a factor in the jury's deliberations. Additionally, the fact that the erroneous information was a real factor in the jury's deliberations is illustrated by the fact that the jury requested that the judge, ". . . explain the types of evidence. . . also proof beyond a reasonable doubt, and also, how are we to use the evidence?" [Tr.VI:3]. Thus, it is clear that the jury considered all of the evidence against the defendant before reaching the verdict. In view of the fact that the first trial was a hung jury, the jury relied on false evidence to support the verdict and the case against the defendant was circumstantial if the case were re-tried without this erroneous information the jury would probably acquit the defendant. *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980); see also *United States v.*

*Colon-Munoz*, 318 F.3d 348, 358 (1st Cir. 2003).   The presentation of false and misleading evidence to the juries deprived the defendant of his right to a fair trial. U.S.C.A. 6th Amendment. This information would have been a real factor in the jury's deliberations in the defendant's trials. *Davis v. Boston Elevated Ry.*, 235 Mass. 482, 495-496 (1920); *Commonwealth v. Markham*, 10 Mass. App. Ct. 651, 654 (1980). The significance of this information is illustrated by the fact that both prior attorneys would have presented this information to the jury if it was available at the time [Ex.:3-4]. This evidence would have been the only unequivocal evidence that Taylor was not the source of the stain and casts real doubt on the justice of the conviction [Ex:3-4]. *Commonwealth v. Markham,* 10 Mass. App. Ct. 651, 654 (1980).

The unavailability of the results of DNA testing on the stain from the brown coat concluding that Gwendolyn Taylor [the victim] was not the source of the sample at the time of the defendant's trials deprived the Petitioner of his right to "have compulsory process for obtaining witnesses in his favor" as provided by the Sixth Amendment to the United States Constitution; denied the Petitioner of the opportunity to produce all proofs that may be favorable to him; deprived the Petitioner of the due process of law as required by the Fifth Amendment to the United States Constitution; denied the Petitioner of his rights to a fair trial and deprived him of his rights pursuant to the Fourteenth Amendment to the United States Constitution. *U.S.C.A. 14; U.S.C.A. 5, U.S.C.A. 6.* In view of the fact that the specific testing was not available until after the Petitioner's trial, This information is new not frivolous or duplicative of any other evidence. *Dickerson v. Attorney General*, 396 Mass. 740, 744-745 (1986); *Commonwealth v. Francis*, 411 Mass. 579, 584 (1992).

19

**PETITIONER'S CONVICTIONS WERE OBTAINED IN VIOLATION OF HIS FEDERAL RIGHTS TO PRESENT WITNESSES IN HIS FAVOR AS PROVIDED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; IN VIOLATION OF HIS RIGHTS TO A FAIR TRIAL; IN VIOLATION OF HIS RIGHTS TO DUE PROCESS OF LAW AND IN VIOLATION OF HIS RIGHTS TO PRESENT EVIDENCE IN HIS FAVOR AS PROVIDED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION DUE TO THE COMMONWEALTH'S DESTRUCTION/FAILURE TO PRESERVE EVIDENCE**

Federal Constitutional law requires that the defendant is entitled to a fair trial. U.S.C.A. Fourteenth; U.S.C.A. Fifth. Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. This standard of fairness requires that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system. *California v. Trombetta*, 476 U.s. 479, 485 (1984). Analyzing a claim based on the destruction of potentially exculpatory evidence, is controlled by clearly established federal law, set forth by the Supreme Court in *Arizona v. Youngblood*, 488 U.S. 52 (1988) and *California v. Trombetta*, 467 U.S. 479 (1984); *DiBenedetto v. Hall,* 272 F.3d 1 (1st Cir. 2001). In *Youngblood,* the Supreme Court held that the police's failure to preserve potentially exculpatory semen evidence in a rape case was not a due process violation unless the police had acted in bad faith. 488 U.S. at 337-38. Nonetheless, simple good faith is not a complete exoneration. See *United States v. Alston*, 112 F.3d 32, 35 (1st Cir. 1997) ("We are not

prepared to say that the government's `good faith' is always and everywhere a complete defense to a due process claim where the government deliberately alters evidence that might otherwise have exculpated the defendant."). A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. *Brady* v. *Maryland,* 373 U.S., at 87. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. *United States* v. *Agurs,* 427 U.S., at 112. To meet the standard of constitutional materiality, see *United States* v. *Agurs,* 427 U.S., at 109-110, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 476 U.s. 479, 489 (1984); *DiBenedetto v. Hall*, 272 F.3d 1, 13 (1st Cir. 2001).

In this case, according to the Boston Police Crime Laboratory Report, two items tested positive for the presence of blood however, no further testing was done. Preliminary tests on the white slacks worn by the victim [item 9] and the white long sleeve sweater identified as being "used as a ligature" [item 12] tested positive for the presence of blood [Ex:4]. In preparation for the filing of the motion for a new trial, undersigned counsel attempted to locate the physical evidence in this case [Ex:5]. The pants and the sweater were significant since the Crime Laboratory report indicates that they preliminarily tested positive for the presence of blood [Ex.:4].

The loss of the sweater/ligature was significant since it was the means by which Taylor was killed. For example, the Commonwealth maintained that Taylor died as a

result of "Mechanical Asphyxia"/strangled by other person(s) [Tr.IV:115]. This fact was emphasized in the testimony of the Medical Examiner, Dr. Suarez, when he stated that initially he saw a "white cloth" – an initial impression --. . . tied tightly around her neck" [Tr.IV:96]. Later, Suarez testified that the item around Taylor's neck was a sweater. According to Suarez, "It was a white sweater that had been wrapped around her neck and tightened in the back by twisting . . ." [Tr.IV:96]. Suarez highlighted the importance of the sweater when he testified, "In a case like this, obviously, the first thing you're going to do is recover the ligature, the thing with which I subsequently determined this woman was killed, take that off, save it" [Tr.IV:100].

According to Colombo[8], if blood were in fact present on the white slacks (Item 9) and the white sweater (Item 12), and if these items were stored properly, it is possible that results could have been obtained using polymerase chain reaction technique (PCR) based short tandem repeat (STR) testing [Ex.:1,5]. The PCR technique and fluorescent detection methods are used in order to examine STR markers [Ex.:1]. The DNA profile from a known individual may be compared to the DNA profile obtained from biological samples of unknown origin collected at a crime scene. If the DNA Profile from a known individual is different from the DNA profile from the evidence samples, that known individual is excluded as the source of the sample; in other words, that individual cannot be the source of the DNA sample [Ex.:1].

Upon inquiry to the Crime Laboratory, undersigned counsel was told that these items were signed out to the District Attorney's office on September 30, 1986 [Ex.:5]. Undersigned counsel went to the Suffolk County Superior Court Clerk's office in an attempt to locate these items and they could not be located [Ex.:5]. A review of the

---

[8] Colombo is the analyst from Cellmark that performed the post-conviction testing.

docket indicates that on October 9, 1986, the District Attorney's Office "acknowledged receipt" of the trial exhibits, including the white sweater [exhibit #9] and the white pants [exhibit #10].   According to the docket, the Assistant District Attorney, Ronald Moynihan signed the exhibits out from the Clerk's Office.  The pants and the sweater were never produced after the representative from the District Attorney's [George Gushue] acknowledge receipt of them on October 17, 1989 [Ex.:5].

In fact, during his opening statement in 1993, the Assistant District Attorney admitted that Taylor's clothing and the defendant's jacket, ".. will not be presented . . . because unfortunately, ladies and gentlemen, it's been lost" [Tr.II:14].

Unfortunately, after looking for these items in the clerk's office and inquiring of the District Attorney's Office and the Crime Laboratory, it became apparent that the items were lost [Ex.:5].  After numerous oral and written requests, these items were not produced by the District Attorney's office [Ex.:5].  If these items were available, undersigned counsel would have forwarded them along with the other items to Cellmark Diagnostics for the appropriate and available DNA (PCR) (STR) testing [Ex.:1]; [Ex.:6]. As discussed above, fluorescent STR markers were first described in 1991, and the first multiplex STR kits became available in 1996 [Ex.:1]. This testing could have been done when other items were tested in 2001.  The testing of these items was crucial since there was no evidence that the defendant or the victim was bleeding during the incident. Accordingly, the blood on the ligature (murder weapon) and the pants would have come from the real perpetrator.  In view of the fact that the items preliminarily tested positive for the presence of blood, the exculpatory value that was apparent before the evidence was destroyed.  Additionally, in view of the fact that these were the only areas that blood

23

was detected the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 476 U.s. 479, 489 (1984); *DiBenedetto v. Hall*, 272 F.3d 1, 13 (1st Cir. 2001). The fact that hairs found on the white slacks were dissimilar to both the Petitioner and the victim illustrates that the results of this testing would be exculpatory. *Id.*; *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 20-21 (1993). If testing established that the Petitioner was not the source of the blood on the pants and/or the "ligature" it would be material since considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Harwood, supra* at 295, quoting *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991). This evidence would be compelling since post-conviction testing established that one of the Commonwealth's primary premises [that Taylor was the source of the stain on the lapel of the brown coat] was erroneous [See Argument I]. Since the evidence is lost, testing on the sweater or ligature impossible. Since the loss of evidence threatened the defendant's right to a fair trial dismissal is an appropriate remedy in this case. *Commonwealth* v. *Lydon*, page 419 413 Mass. 309, 317 (1992), quoting *Commonwealth* v. *Henderson* 411 Mass. 309, 310 (1991).

The defendant recognizes that blood group testing was not done on these items up until the time that they were lost. However, testing for blood group substances only serve to provide general identifying markers and do not provide a positive identification [Tr.IV:83]; [Ex.:2, 3]. Both prior trial attorneys did not request blood group testing due to the large percentage of the population that are part of the same blood groupings [Ex.:2, 3]. Both attorneys maintain that if these items were properly preserved and DNA testing was available at the time of the defendant's trials, they would have requested the testing

24

to eliminate Mr. Rosa as the source of the blood stains on the pants and the sweater [Ex.:2, 3]. Fluorescent STR markers were first described in 1991, and the first multiplex STR kits became available in 1996 [Ex.:1].

The loss of the white pants and the white sweater [also described as ligature] prevent the defendant from performing DNA testing on the stains that tested positive for the presence of blood. If these items were currently available, testing could be done to identify the source of the blood and ultimately, the perpetrator. In *Commonwealth v. Olszewski*, 401 Mass. 749, 7654 (1988), the Supreme Judicial Court recognized that the loss of evidence which is material and potentially exculpatory poses special problems for a defendant because he is put in a position where he is unable to establish the exculpatory nature of the lost or destroyed evidence. "Because the [evidence has] been destroyed, it is no longer possible to determine whether the defendant would have obtained any evidence of an exculpatory nature had [it] been made available to him for inspection or examination. To require the defendant at this stage to prove that the [evidence was] in fact exculpatory would, however, convert the disclosure duty established by *Brady* v. *Maryland*, 373 U.S. 83 (1963) and its progeny into 'an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.' *United States* v. *Bryant*, [439 F.2d 642, 648 (D.C. Cir. 1971)]." *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). It is in this context that we stated in *Commonwealth* v. *Charles*, 397 Mass. 1, 13-14 (1986), that "[w]e have repeatedly stressed the need for prosecutors and police to do their utmost to preserve and present 'exculpatory evidence which is available to the prosecution.'"

Given these circumstances, the defendant was not afforded a truly fair trial.

25

The fact that the Petitioner was denied the opportunity to test these items and denied the opportunity of presenting the results of the testing on these items to the jury deprived him of his federal constitutional rights to present evidence in his favor, his right to a fair trial and due process of the law. U.S.C.A. 5th; U.S.C.A. 6th; U.S.C.A. 14th.

## CONCLUSION

For all of the above-stated reasons the Petitioner respectfully requests that the Court grant this petition.

THOMAS ROSA
By his attorney,


Kathleen M. McCarthy
160 State Street, 8th Floor
Boston, MA 02108
(978) 975-8060
B.B.O. #550624