## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————
                                  )
THOMAS ROSA, JR.                  )
           Petitioner,            )
                                  )
v.                                )     Civil Action No. 04-10174-NG
                                  )
MICHAEL T. MALONEY                )
           Respondent.            )
———————————————————)

### RESPONDENT'S MEMORANDUM IN OPPOSITION TO THE
### PETITION FOR WRIT OF HABEAS CORPUS

This memorandum of law is submitted in opposition to the petition for a writ of

habeas corpus filed by Thomas Rosa, Jr. ("the petitioner").   As argued in this

memorandum, the petition must be denied because the petitioner's claims were

procedurally defaulted in state court and the petitioner cannot demonstrate cause and

prejudice or actual innocence to excuse the default.   Furthermore, the petition should be

denied where the first claim is not cognizable on habeas review and where the petitioner

cannot demonstrate that the state court's adjudication of his claims on the merits resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States.

### PRIOR PROCEEDINGS

On February 11, 1986, a Suffolk County grand jury returned indictments charging

the petitioner with murder in the first degree, kidnapping and aggravated rape.[1]   The

petitioner's first trial ended in a mistrial on October 4, 1986, when the jury could not reach

———————————————

[1] The docket sheets that support these assertions of prior proceedings were filed
as attachments to the respondent's motion to dismiss (docket entries 4 and 5).

a verdict.  On November 25, 1986 a second jury found the petitioner guilty of all charges. The Supreme Judicial Court reversed the convictions on March 9, 1992.  *Commonwealth v. Rosa*, 412 Mass. 147, 587 N.E.2d 767 (1992).  See (S.A. 1).[2]  On March 4, 1993, following a third trial, a jury found the petitioner guilty of murder and kidnapping, and not guilty of aggravated rape.  The petitioner was sentenced to life imprisonment on the murder conviction and to a concurrent sentence of nine to ten years on the kidnaping conviction. The Supreme Judicial Court affirmed the convictions on February 9, 1996.  *Commonwealth v. Rosa*, 422 Mass. 18, 661 N.E.2d 56 (1996) (S.A. 4).

Thereafter the petitioner filed several pro se post-conviction motions in the trial court, including a motion to dismiss, a motion for release from unlawful restraint and a motion for new trial.  The court never acted on the pro se motions.  On April 18, 2002, appointed counsel filed an amended motion for new trial.  On January 31, 2003, Justice Charles Spurlock denied the motion without a hearing.  On February 3, 2003, after receiving the petitioner's supplemental memorandum, Judge Spurlock ordered that his ruling stood.

On February 25, 2003, the petitioner filed a petition for leave to appeal the denial of his motion for new trial with the single justice of the Supreme Judicial Court, pursuant to M.G.L. c. 278, § 33E.  (S.A. 5).  Following a hearing on June 11, 2003, Justice Martha Sosman denied the petition on October 17, 2003, in a written memorandum of decision and order.  (S.A. 8).

On January 26, 2004, the petitioner filed a petition for writ of habeas corpus in this

---

[2] The exhibits from the respondent's supplemental answer will be referred to as (S.A. --).

court.    On February 24, 2004, the respondent filed a motion to dismiss the petition as time

barred pursuant to 28 U.S.C. § 2241(d)(1).   This court denied the motion to dismiss on

June 11, 2004.    The respondent filed an answer and supplemental answer on July 14,

2004.

## STATEMENT OF FACTS

_____The Massachusetts Supreme Judicial  Court's recitation of the facts of the

petitioner's crimes is entitled to the presumption of correctness under 28 U.S.C.

§2254(e)(1).  *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*,

265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1sr Cir. 2000).   The

AEDPA presumption of correctness applies to all "basic, primary, or historical facts"

underlying the state court's conclusion.   *Gunter v. Maloney*, 291 F.3d at 76; *Sanna v.

DiPaolo*, 265 F.3d at 7.   In addition, the presumption of correctness extends to factual

determinations made by both state trial and appellate courts.   *Rashad v. Walsh*, 300 F.3d

27, 34 (1st Cir. 2002), and to any factual findings implicit in the state court's ruling.

*LaVallee v. Delle Rose*, 410 U.S. 690, 692 (1972); *Weeks v. Snyder*, 219 F.3d 245, 258

(3d Cir.), *cert. denied*, 531 U.S. 1003 (2000).   As the First Circuit has noted, "[a] habeas

petitioner must clear a high hurdle before a federal court will set aside any of the state's

factual findings."  *Mastracchio v. Vose*, 274 F.3 590, 598 (1st Cir. 2001).   The petitioner

has the burden of rebutting the presumption of correctness by clear and convincing

evidence.  28 U.S.C. § 2254 (e)(1).

The Supreme Judicial Court found the following facts concerning the petitioner's

crimes:

3

_____Sometime around midnight on the night of December 6,1985, Gwendolyn Taylor, in the company of one Charles Ferguson, left the home of Ferguson's aunt in the Dorchester section of Boston. Taylor lived a short distance away on Talbot Avenue. The couple proceeded down Talbot Avenue. At a point within 150 feet of Taylor's apartment the two parted ways. Ferguson immediately ran back to his aunt's house, where he then telephoned Taylor's apartment, to see if she had made it home safely.

Ferguson's stepsister, Charita Offley, shared the apartment with Taylor. She answered the telephone, stating that Taylor had not yet arrived home. Ferguson called again five minutes later, and was again told that Taylor had not returned. Ferguson called a third and fourth time, and at that point, Charita went onto the porch of the third-floor apartment to look for Taylor on the street. She saw Taylor sitting on the stairs to the apartment building's entrance, with a man standing in front of her. Charita shouted to Taylor to come to the telephone. Taylor responded that she would call Ferguson back. When Charita told Ferguson this, Ferguson demanded to speak to Taylor. Charita then called out to Taylor again, and Taylor repeated that she would call Ferguson back.

_____A few minutes later the doorbell to Taylor and Charita's apartment rang. Charita went to the porch and saw Taylor had returned to the entrance of the building. Taylor saw Charita on the porch, and asked her to come downstairs. Arriving in the entranceway, Charita saw a man standing beside Taylor, holding what Charita testified was "a shiny object" near Taylor's shoulder. Charita described Taylor as visibly frightened, and Taylor asked Charita if she had $100. Charita went back upstairs to the apartment to see if their other two roommates had any money. The man at Taylor's side shouted after Taylor not to call the police, and Taylor told Charita that "he's not kidding."

_____Charita woke her other two roommates, Kevin Neal and "Tammy" Offley, and reported that Taylor was in trouble. All three went onto the porch and saw that Taylor and the man had moved to the other side of Talbot Avenue, with the man holding Taylor close to him with his arm around her neck. Taylor, in an "hysterical" tone, again asked for $100. Neal states that he did not have that much money. The man and Taylor then walked about in a nearby park and basketball court, finally proceeding down an alley.

_____Neal rushed down the stairs while Charita called the police. Shortly thereafter, the Boston police arrived. The three roommates related events to two police officers, and the officers drove down the alley with lights on to search for Taylor. They then waited for one-half hour in silence to listen for any sounds. These searches were in vain.

_____Then next morning an employee of a nearby automobile body shop arrived at work.

4

He noticed that the door of one of the motor vehicles awaiting repair was open, and he could see a limp human arm hanging out the door. Walking up to the vehicle he saw a woman's body, naked, with a cloth wrapped around her neck. He called the police, who subsequently identified the victim as Gwendolyn Taylor.

At trial, two witnesses identified the defendant as the man with Taylor and the person who walked off with Taylor the last time she was seen alive. Charita Offley identified Rosa at trial, stating she saw his face when she, Taylor, and the man were in the entryway of the apartment building.[3] A second witness, Sharon Areh, testified that she had seen Rosa holding Taylor at the entrance to the apartment building. Areh had been walking home with a companion at the time. She stated at trial that she recognized the man holding Taylor as Rosa. Areh had seen him on several occasions previously because Rosa lived upstairs from Areh's cousin.[4]

---

[3] Charita's pretrial description and identification of Rosa was consistent with her trial testimony. Charita described the assailant as an Hispanic male, approximately five feet, nine inches tall, with a slim build, and wearing black pants and a tan coat. Charita went to the office of Boston police Detective Edward Doyle and requested to look at photographs in an attempt to identify the man who she had seen abduct Taylor. After she informed Detective Doyle that the man she saw was an Hispanic male, Detective Doyle have Charita a book of photographs of Hispanic males to review.

After looking through the first book for about two minutes, Charita came to a picture and told Detective Doyle that the picture "looks like him but this isn't him. His eyes are different." Charita continued to look through the same book and once again came across the same picture. She recognized the second picture was of the same man as the first picture, but not the man she saw assaulting Gwendolyn Taylor. Once Charita completed that entire book, she looked at the second book with pictures of Hispanic males. When Charita came across the defendant's picture, she told Detective Doyle, "This is him." Detective Doyle then asked Charita if she was sure, to which Charita responded, "I'm definite. If it's not him it's an identical twin." Charita made subsequent in-court identifications of the defendant and the defendant's tan coat at the trial and while testifying in other preliminary court appearances. Charita also testified that there was no doubt in her mind that the defendant was the man she observed holding the victim against her will. (Footnote in original opinion).

[4] Areh recognized the defendant as a man that she had seen in her cousin's apartment building on several occasions prior to December 7, 1985. The day after the incident, Areh contacted Detective Sergeant Charles M. Horsley of the Boston police department's homicide unit. On December 9, Sergeant Horsley brought Areh to the Area B police station to look at photographs with Detective Doyle. Areh found the same picture of the defendant that Charita had picked out

_____Physical evidence corroborated the identification of the two witnesses. Police detectives had collected physical evidence at the scene of the crime, including blood samples. The results of the blood typing of those samples were consistent with the government's theory that Rosa committed the crime. Several hairs were found on Taylor's clothing, although none could be matched to anything that would implicate Rosa. The other major piece of evidence was a brown coat, found at Rosa's apartment. Two identification witnesses, Charita and Tammy Offley, had stated that the man with Taylor had been wearing a brown coat and that the coat found at Rosa's was the same coat they had seen.[5]

*Commonwealth v. Rosa*, 422 Mass. 18, 19-21, 661 N.E.2d 56, 58-59 (1996).

_____In deciding the petitioner's application for leave to appeal, the single justice of the

Supreme Judicial Court found the following facts with respect to the issues now claimed

on habeas review:

_____At trial, the Commonwealth presented evidence that a small stain on the defendant's coat (which some, but not all, eyewitnesses described him as wearing at the time he was seen abducting the victim) was consistent with the victim's blood type. However, the defendant countered this evidence with abundant evidence that would minimize, if not eliminate entirely, its significance: that the victim's blood group was common (comprising 40% of the population); that two of the defendant's brothers had the same blood type as the victim; that the stain on defendant's jacket could have been caused by someone merely coughing or sneezing in the vicinity of the defendant; that there was no way to tell how old the stain was; that there was no blood on the jacket (even though the victim had bloody mucous in her mouth); and that the Commonwealth's strongest identification witness (Sharon Areh, who knew the defendant and had walked directly past the defendant and the victim outside the victim's apartment as the defendant was leading the victim away) testified that the defendant was *not* wearing the jacket at the time.

(S.A. 8, p. 2).

---

the previous day and identified the defendant as the man she had seen forcing the victim to walk with him on Talbot Avenue on December 7. (Footnote in original opinion).

[5]  The coat was not introduced into evidence at this trial. Sometime after the second trial, through the fault of neither party, the coat was lost. Evidence regarding identification of the coat was given by having the witnesses testify to having identified the coat at a prior hearing. (Footnote in original opinion).

**ARGUMENT**

I.    **THE PETITIONER IS NOT ENTITLED TO HABEAS CORPUS RELIEF WHERE HIS CLAIMS WERE PROCEDURALLY DEFAULTED AND HE HAS FAILED TO ESTABLISH CAUSE AND PREJUDICE OR THAT A MISCARRIAGE OF JUSTICE WILL RESULT IF THE CLAIMS ARE NOT REVIEWED.**

"The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial. Rather, the remedy is limited to the consideration of federal constitutional claims." *Burks v. DuBois*, 55 F.3d 712, 715 (1st Cir. 1995). *See Herrera v. Collins*, 506 U. S. 390, 400 (1993) (affirming that the purpose of federal habeas corpus review is to ensure that individuals are not imprisoned in violation of the Constitution). *See also Barefoot v. Estelle*, 463 U. S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials"). Thus, federal habeas review is precluded, as a general proposition, when a state court has reached its decision on the basis of an adequate and independent state-law ground. *See Coleman v. Thompson*, 501 U. S. 722 (1991). In *Coleman*, the Supreme Court held that where

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id*. at 750. *See Tart v. Massachusetts*, 949 F.2d 490, 496-497 (1st Cir. 1991); *Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 493 (1st Cir.), *cert. denied sub nom., Palmariello v. Butler*, 493 U. S. 865 (1989). A petitioner's procedural default constitutes an adequate and independent state ground so long as the state consistently applies the

7

rule and has not waived it. *Wainwright v. Sykes*, 433 U. S. 72, 87 (1977); *Burks v. DuBois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir. 1987), *cert. denied*, 485 U. S. 990 (1988). The very nature of the independent and adequate state ground inquiry, i.e., one borne out comity and federalism concerns, requires that it be addressed by this Court at the outset. *Lambrix v. Singletary*, 520 U. S. 518, 523-24 (1997).

**A.    THE GATEKEEPER'S DECISION WAS INDEPENDENT OF FEDERAL LAW.**

In *Coleman v. Thompson*, 501 U.S. at 729, the Supreme Court reaffirmed the principle that it would not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *See Lambrix v. Singletary*, 520 U. S. 518, 523-24 (1997). On direct appeal, this precept operates as a jurisdictional bar to avoid advisory opinions. *Id.; Herb v. Patcairn*, 324 U.S. 117, 117, 125-126 (1945). On habeas review, the operation of the procedural bar is grounded not on jurisdiction but on concerns of comity and federalism. *See Trest v. Cain,* 522 U.S. 87 (1997); *Lambrix v. Singletary*, 520 U. S. 518, 523-24 (1997) ; *Coleman v. Thompson*, 501 U.S. at 729-731.

When the state decision "fairly appears to rest primarily upon federal law or to be interwoven with federal law," the federal court presumes that the decision is not based on independent state grounds. *Coleman v. Thompson*, 501 U.S. at 735. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991); *Brewer v. Marshall*, 119 F.3d at 999-1000. However, that presumption does not apply where, as here, there is no indication that the single justice rested his decision on federal law. *See Brewer v. Marshall*, 119 F.3d at 1000.

As a matter of Massachusetts appellate procedural law, there exist special provisions

for those indicted for, and convicted of, first degree murder.  Under M.G. L. ch. 278, § 33E, such a "capital" defendant has a right of direct appeal to the Supreme Judicial Court for the Commonwealth ("SJC"), without the case being first entered on the docket of the Appeals Court.  *See Dickerson v. Latessa*, 872 F.2d 1116, 1117-1118 (1st Cir. 1989).  The scope of the SJC's review is exceedingly broad under § 33E -- it reviews the "whole case" to determine whether the verdict is against the weight of the evidence, and the court is empowered to order a new trial or to reduce the verdict to a lesser degree of guilt if the interests of justice so require.  *See Dickerson v. Latessa*, 872 F.2d at 1118; 32 Nolan & Henry, *Criminal Law*, § 187 (2d ed. 1988 and 1993 Supp.).

After this plenary review on direct appeal, a capital defendant may not appeal the decision of the Superior Court denying his motion for a new trial unless the "gatekeeper," *i.e.*, a single justice of the Supreme Judicial Court for Suffolk County, finds that the appeal presents a "new" and "substantial" question which ought to be determined by the full court. *Dickerson v. Latessa*, 872 F.2d at 1118.  In other words, it is the gatekeeper's duty to "screen[ ] out appeals that lack merit."  *See Commonwealth v. Francis*, 411 Mass. 579, 584, 583 N.E.2d 849 (1992).  The gatekeeper's denial of a defendant's petition for leave to appeal is final and unreviewable. *Commonwealth v. Ambers*, 397 Mass. 705, 710-711, 493 N.E.2d 837 (1986); *Leaster v. Commonwealth*, 385 Mass. 547, 548, 432 N.E.2d 708, 709 (1982).  *See McLaughlin v. Gabriel*, 726 F.2d 7, 9 (1st Cir. 1984).  The rule barring appeals from the denial of gatekeeper petitions is a "firmly established and regularly followed" rule of Massachusetts practice.  *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

A gatekeeper justice's denial of a petitioner's application for leave to appeal, is a finding by the SJC of procedural default on the part of the petitioner and, as such, is a "classic example of an independent and adequate state ground."  *Simpson v. Matesanz*, 175 F. 3d 200, 207 (1st Cir. 1999)(citations omitted).  *See Moore v. Ponte*, 186 F.3d 26, 32 (1st Cir. 1999)(denial of gatekeeper petition functions as a procedural default).  In making the determination under G.L. c. 278, § 33E, "the single justice does not make a decision directly on the merits of any claim.  He examines the claims to decide whether there exists a new and substantial question which ought to be determined by the full court."  *McLaughlin v. Gabriel*, 726 F.2d 7, 9 (1st Cir. 1984).  "Consequently, a screening decision by a single justice, which merely decides whether the full court should review the case to determine the state question of law does not waive the [procedural default] rule *a fortiori*."  *Id*.

The petitioner raises two claims in his habeas petition: 1) that his rights to due process and to produce all proofs favorable to him were violated where post-conviction DNA testing eliminated the victim as the source of a stain on the petitioner's coat; and 2) that his rights to a fair trial and due process were violated by the Commonwealth's failure to preserve evidence.  The petitioner first raised these claims in an amended motion for new trial filed in April 2002.  The state trial court denied the motion without reaching the merits of the claims.  (See S.A. , Exhibit 7, Addendum p. 1).  The petitioner also raised these claims in his request for leave to appeal the denial of his motion for new trial.  (See S.A. Exhibit 5).  The parties agreed that the claim regarding the DNA testing of the jacket was new but the single justice of the SJC determined that the claim was not substantial (S.A. 8, pp. 2-6).  The single justice found the other issue to be neither new nor substantial.

(S.A. 8, pp.6-7).

The state court's rejection of the petitioner's request for appellate review clearly rests on his default of state procedural law. *See Avellar v. DuBois*, 30 F. Supp. 76, 79 (D. Mass. 1998) (as an adequate and independent state ground, the gatekeeper's "decision is a sufficient basis in and of itself to dismiss the petition"). This case is unlike *Phoenix v. Matesanz*, 189 F. 3d 20, 26 (1st Cir. 1999). In *Phoenix,* the First Circuit held that a gatekeeper's determination that a claim of ineffective assistance of counsel was new but not substantial was interwoven with federal law because the standard of review for ineffective assistance is so similar in the state and federal contexts. In this case, the gatekeeper merely determined that the newly discovered DNA evidence did not create a substantial risk that the jury would have reached a different verdict 's decision (S.A. 8 p. 2, 6). This sets out the operation of the procedural bar, independent of federal law, and not a decision on the merits. *See McLaughlin v. Gabriel*, 726 F.2d at 9.

**B.    THE GATEKEEPER'S DECISION WAS AN ADEQUATE BASIS FOR THE STATE COURT JUDGMENT.**

"[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.'" *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (citations omitted). *See Ford v. Georgia*, 498 U.S. 411, 423 (1991); *Brewer v. Marshall*, 119 F.3d at 1001. The SJC strictly and regularly enforces the "gatekeeper" provision of G. L. c. 278, §33E. *See Trigones v. Attorney General*, 420 Mass. at 863, 652 N.E.2d at 895; *Leaster v. Commonwealth*, 385 Mass. at 548, 432 N.E.2d at 709. In fact, "a state's efforts to stop gross miscarriages of justice should not suddenly force it to grapple with complex federal issues that its procedural rules would otherwise lawfully bar." *McCown v. Callahan*, 726

11

F.2d 1, 4 (1st Cir.), *cert. denied*, 469 U.S. 839 (1984).

In addition, "[t]here is no constitutional impediment to" barring an appeal of the denial of a collateral attack on a state conviction. *See Brewer v. Marshall*, 119 F.3d at 1001. In fact, it is well settled that there is no constitutional right to even a direct appeal, *Abney* v. *United States*, 431 U.S. 651, 656 (1977); *McKane* v. *Durston*, 153 U.S. 684, 687 (1894), let alone an appeal from the denial of post-conviction relief. *Herrera* v. *Collins*, 506 U.S. at 408-410; *Murray* v. *Giarrantano*, 492 U.S. 1, 10 (1989); *Pennsylvania* v. *Finley*, 481 U S. 551, 557 (1987). *See United States* v. *MacCollom*, 426 U.S. 317, 324 (1976) (due process distinguishes between a first appeal of right and subsequent discretionary appeal within the same system). Here, because petitioner's claims did not meet the requirements of §33E, the SJC enforced the procedural bar. Accordingly, this Court should hold that the conviction rests on an adequate and independent state-law ground as to these claims and dismiss the petition.

### C. THE PETITIONER FAILED TO ESTABLISH "CAUSE" OR "PREJUDICE" FOR HIS DEFAULT OR THAT A MISCARRIAGE OF JUSTICE WILL RESULT IF THE CLAIMS ARE NOT ENTERTAINED.

Federal habeas review of the petitioner's claims is therefore precluded absent a showing of "cause for" and "prejudice from" the procedural default. *Coleman v. Thompson*, 501 U.S. at 750; *Wainwright v. Sykes*, 433 U.S. at 87. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Magee v. Harshbarger*, 16 F.3d 469, 471 (1st Cir. 1994).

The petitioner alleges that both of his claims could not have been brought earlier because the DNA technology that was required to test the evidence was not available until 1996. This reasoning provides sufficient cause for the first claim regarding the DNA on the coat, but does not excuse the default of the second claim. As the gatekeeper found in her denial of the petitioner's application for leave to appeal, the victim's clothing was lost sometime prior to the third trial, but the petitioner had never made any attempt to conduct any testing of the evidence during all the years when the clothing was available to him. (S.A. 8, p. 7). The petitioner has not demonstrated why he could not have raised the claim regarding the loss of potentially exculpatory evidence on direct appeal if he thought that testing of the evidence would have produced anything helpful to his case. His failure to present the claim at the earliest possible time precludes relief under Massachusetts law. *Fuller v. Commonwealth*, 419 Mass. 1002, 1003, 643 N.E.2d 36, 37 (1994); *Commonwealth v. Ambers*, 397 Mass. 705, 707, 493 N.E.2d 837, 839 (1986); *Commonwealth v. Pisa*, 384 Mass. 362, 365-366, 425 N.E.2d 290, 293 (1981).

Nor can the petitioner demonstrate prejudice to excuse his procedural default. Prejudice requires the petitioner to demonstrate "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 708, 714 (1st Cir. 1994), *quoting United States v. Frady*, 456 U.S. 152, 170 (1982). Based on the single justice's findings, it cannot be said that the newly discovered DNA results or the Commonwealth's loss of the victim's clothing met this standard. As the single justice found, "the Commonwealth's evidence concerning the stain on the petitioner's coat was of marginal, if any, significance," and "whatever link the

13

Commonwealth hoped to establish between the stain and the crime was essentially eradicated by the defendant."  (S.A. 8, p. 3).  The Commonwealth presented strong eyewitness identification testimony and the prosecutor failed to even address the weaknesses in the stain evidence in its closing argument, indicating that the Commonwealth's case did not rest on the forensic evidence of the stain.  The single justice concluded that:

> "[n]othing about the DNA evidence here is genuinely exculpatory-i.e., this is not a case where some trace evidence of bodily fluids found on the victim had been linked to the defendant by less specific testing but had since been shown by DNA testing to come from someone else.  Rather, the DNA evidence now proffered would have neutralized what has already been an extremely weak link on which the prosecution's case did not in fact rely.  The defendant's motion for new trial thus failed to establish any substantial risk that this evidence would have made a difference in the outcome of the case.

(S.A. 8, p. 6).

Finally, in the absence of a demonstration of both cause and prejudice, the petitioner could be excused from his procedural default if he can demonstrate that failure to entertain these claims would result in a miscarriage of justice.  *Ortiz v. DuBois*, 19 F.3d at 714 *quoting Murray v. Carrier*, 477 U.S. at 495-496.  *See Sawyer v. Whitley*, 505 U.S. 333, 339-340 (1992).  This narrow exception is reserved for those rare cases in which the conviction of a petitioner who may be actually innocent of the charges will occur if a constitutional error is not redressed.  *See Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("this Court [has] explicitly tied the miscarriage of justice exception to the petitioner's innocence").  To establish actual innocence, "petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable

14

doubt." *Simpson v. Matesanz*, 175 F.3d at 210, *quoting Schlup*, 513 U.S. at 327.[6]  This situation may arise where "a petitioner supplements a constitutional claim with a 'colorable showing of factual innocence.'"  *McCleskey v. Zant*, 499 U.S. 467, 495 (1991), *quoting Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).  In other words, the miscarriage of justice exception is concerned with "actual" as compared to "legal" innocence.  *See Sawyer v. Whitley*, 505 U.S. at 339; *Smith v. Murray*, 477 U.S. 527, 537 (1986).

With regard to the first claim, the petitioner alleges that if a new jury heard the new DNA results it would probably acquit him.  (Pet. memo p. 18).  However, as the single justice found, this conclusion is not borne out by the record since the DNA evidence would not have suggested that the defendant was innocent.  As set forth by the single justice in her denial of the petitioner's application for leave to appeal, the only evidence connecting

---

[6]  In *Schlup*, the Supreme Court considered the question of "whether the *Sawyer* standard provides adequate protection against the kind of miscarriage of justice that would result from the execution of a person who is actually innocent."  *Schlup v. Delo*, 513 U.S. at 301.  As the Court explained in discussing a reduced standard, "[t]he paramount importance of avoiding the injustice of executing one who is actually innocent thus requires application of the *Carrier* standard."  *Id.* at 325-326.  *See Murray v. Carrier*, 477 U.S. at 496.  In other words, the Court held that the *Carrier* "probably resulted" standard rather than the more stringent *Sawyer* "clear and convincing" standard governs the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.  *Schlup v. Delo*, 513 U.S. at 326-327.  *See Sawyer v. Whitley*, 505 U.S. at 348; *Murray v. Carrier*, 477 U.S. at 496.  It is an open question in this Circuit whether *Schlup* affects non-death penalty cases.  *See Burks v. DuBois*, 55 F.3d at 718 n.5.  Although the AEDPA does not address the level of proof required to establish actual innocence to excuse a procedural default, it does require proof of actual innocence by "clear and convincing" evidence as means to receiving an evidentiary hearing in federal court on a claim he failed to develop the factual basis for in state court.  *See* 28 U.S.C. §2254(e)(2)(B).  In any event, although this Court should apply the *Sawyer* "clear and convincing" standard in this non-death penalty case, the petitioner's claim does not even meet the *Murray* "probability" standard.

the stain on the coat to the murder was an expert's testimony that the stain was consistent with the victim's blood type. (S.A. 8, p. 2).  The expert acknowledged, however, that the victim's blood type was shared by forty percent of the population and that the stain could have been caused by someone coughing or sneezing near the coat (S.A. 8, p. 2). Moreover, the stain did not contain blood (even though the victim had bloody mucous in her mouth) and the Commonwealth's strongest identification witness (who knew the petitioner and saw him at the closest distance) testified that the petitioner was not wearing the coat at the time she saw him with the victim on the night of the murder.  (S.A. 8, p. 2). Therefore, the stain was a very tenuous part of the Commonwealth's case, which the prosecutor only acknowledged in one sentence of his closing argument (Tr. V/79).  The prosecutor, instead, focused on the eyewitness identifications of the petitioner, which were very strong.  The victim's roommate, who had seen the petitioner holding the victim and threatening her, selected the petitioner's photo out of books of photographs and another witness and neighbor independently corroborated the roommate's identification when she contacted the police and told them that she knew the person who had been with the victim as someone who lived in the same house as her cousin.  (S.A. 8, p. 4).  Finally, when the Supreme Judicial Court described the coat as a "major piece of evidence," it did so only to the extent that two witnesses identified the coat found in the petitioner's apartment as the same one they had seen on the man who was with the victim on the night of the murder, not because of the blood grouping evidence. *Commonwealth v. Rosa*, 422 Mass. 18, 21, 661 N.E.2d 56, 59 (1996) (S.A. 4).   Therefore, the newly discovered DNA results do not demonstrate that the petitioner is actually innocent of the crimes.

Similarly, the fact that the Commonwealth lost the victim's clothing prior to the third

16

trial does not support a claim of actual innocence. The petitioner's mere speculation that DNA testing may have produced exculpatory evidence is not sufficient to meet this standard. (S.A. 8, p. 7). The victim's clothing neither strengthened nor weakened the Commonwealth's case on the primary issue of identification. (S.A. 7 p. 16). It was undisputed that the clothing was used to strangle the victim and the petitioner has not presented any reason to believe that the blood on the clothing came from the killer instead of the victim.

## II.    THE PETITIONER'S FIRST CLAIM OF ACTUAL INNOCENCE IS NOT COGNIZABLE ON HABEAS CORPUS REVIEW.

In his first claim, the petitioner alleges that newly discovered DNA testing on the petitioner's coat would probably result in an acquittal on retrial. He characterizes this claim as a violation of his rights to compulsory process for obtaining witnesses in his favor and a violation of due process as required by the Fifth Amendment (Pet. memo p. 6), but the claim is, in reality, a claim of actual innocence based on newly discovered evidence. Such a claim has never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

The petitioner does not allege that his trial was infected with constitutional error at the time it occurred, but instead claims that the evidence discovered after the trial and direct appeal would substantially weaken the Commonwealth's case on re-trial. This is similar to what the petitioner in *Herrera* did, claiming that since newly discovered evidence showed he was actually innocent, his execution would violate the Eighth Amendment. *Herrera*, 506 U.S. at 396-397. The Supreme Court found that this was not a proper ground for habeas

17

relief based on the principle that "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact." *Id*. at 400,[7] citing to *Moore v. Dempsey*, 261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the petitioner's innocence or guilt but solely the question whether their constitutional rights have been preserved"); *Hyde v. Shine*, 199 U.S. 62, 84 (1905) ("[I]t is well settled that upon habeas corpus the court will not weigh the evidence").  See also *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials").[8]  Therefore this claim is not cognizable on habeas review and must be dismissed.[9]

---

[7] Subsequent to the *Herrera* decision the Supreme Court decided *Schlup v. Delo*, 513 U.S. at 314 in which habeas petitioner's claim of innocence was not itself a constitutional claim but instead a gateway through which he could pass in order to have his defaulted claim of ineffective assistance of counsel considered on the merits.  To the extent that the petitioner wants to use his actual innocence claim as a gateway to excuse his procedural default of the *Brady* claim, he has not satisfied the requisite showing for an actual innocence claim, as discussed, *supra*.

[8] The petitioner's claim also differs from claims of insufficient evidence under *Jackson v. Virgina*, 443 U.S. 307 (1979) brought on habeas review because the evidence authorized for review under *Jackson* is limited to record evidence and does not extend to newly discovered evidence.  *See Herrera*, 506 U.S. at 401-402.

[9] Even if this court finds that the petitioner's first claim is cognizable on habeas review, the petitioner has not claimed, nor can he claim that the gatekeeper's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent, in light of *Herrera* and *Schlup, supra*, and where there is no applicable Supreme Court precedent regarding a petitioner's constitutional right to consideration of post-conviction newly discovered evidence.

III.   **THE PETITIONER'S SECOND CLAIM SHOULD BE DENIED WHERE THE STATE COURT DECISION WAS NOT CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT.**

If this court determines that the procedural default of the petitioner's second claim can be excused, it should find that the claim cannot furnish the basis for habeas relief.[10]

**Standard of Review**

Since Rosa's petition was filed after the effective date of AEDPA, this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). In relevant part, AEDPA precludes a federal court from granting habeas relief unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* at 400 (*quoting* 28 U.S.C. § 2254(d)(1)).

1.     **The "Contrary To" Prong**.

A state-court decision is "contrary to" clearly-established Supreme Court precedent in only two circumstances: (1) "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases; or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529

---

[10] When applying the new habeas corpus standard to the state court's "decision" in this case, the fact of the petitioner's procedural default again becomes apparent as the gatekeeper found the claim waived and only briefly discussed the merits of the claim in the alternative (S.A. 8, pp. 6-7).

U.S. at 405-06.  Under either scenario, to satisfy the "contrary to" clause, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly-established Supreme Court law.  *Id.*   Relief under the "contrary to" prong requires identification of controlling Court precedent and a ruling that the identified precedent demands a particular outcome, i.e., one contrary to that reached by the state court. *Williams v. Matesanz,* 230 F. 3d 421, 425 (1st Cir. 2000); *O'Brien v. Dubois*, 145 F.3d 16, 26 (1st Cir.1998).  The key inquiry is whether the relevant Supreme Court decision "can fairly be said to require a particular result in a particular case." *Id* at 25.

### 2.    The "Unreasonable Application" Prong.

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams,* 529 U.S. at 413.  In making this determination, a habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.

There is no bright line rule as to what constitutes an "objectively unreasonable" application of established Supreme Court precedent.  *Id.* at 410.  As the *Williams* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one.  *Id.*

> Indeed, because Congress used the word "unreasonable". . . and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision

> applied clearly established federal law erroneously or incorrectly.
> Rather, that application [or determination] must also be
> unreasonable."

*Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) (*quoting Williams*, 529 U.S. at 411), *cert.
denied*, 534 U.S. 925 (2001). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001)
(under AEDPA's "broad objective standard, a federal court cannot grant habeas relief
simply because it disagrees with or finds error in the state court's application of federal
law"), *cert. denied*, 535 U.S. 960 (2002). The First Circuit recently has noted that the
question of unreasonableness involves "'some increment of incorrectness beyond error'...
The increment need not necessarily be great, but it must be great enough to make the
decision unreasonable in the independent and objective judgment of the federal court."
*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002), quoting *Francis v. Stone*, 221 F.3d
100, 111 (2d Cir. 2000). Where, for instance, the state court reaches a result that is
"devoid of record support for its conclusion or is arbitrary," the unreasonable application
prong likely will be satisfied. *McCambridge*, 303 F.3d at 37, *citing O'Brien v. Dubois*, 145
F.3d 16, 25 (1st Cir. 1998). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001),
*cert. denied*, 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert.
denied*, 534 U.S. 925 (2001).

Moreover, the Supreme Court recently made clear that there is no requirement under
the AEDPA for the state courts to directly cite, or even be aware of Supreme Court
decisions, so long as "neither the reasoning nor the result of the state-court decision
contradicts them." *See Early v. Packer*, 537 U.S. 3,8 (2002) (per curiam). Since the
reasons underlying the state court's rejection of petitioner's claims are apparent from the

record, it matters not whether the state courts here cited to specific Supreme Court precedent for purposes of the AEDPA analysis. *See Downs v. Spencer*, 238 F.Supp.2d 332, 336-37 (D. Mass. 2003) (discussing *Early* and holding that state court's failure to directly cite controlling Supreme Court precedent was "entirely irrelevant" where reasoning employed by state court was entirely consistent with Supreme Court precedent).

The petitioner claims that the Commonwealth's loss of the victim's clothing prior to the third trial violated his due process rights and his Fifth Amendment right to present evidence in his favor, in violation *Brady v. Maryland*, 373 U.S. 83 (1963), *California v. Trombetta*, 467 U.S. 479 (1984)*, and *Arizona v. Youngblood*, 488 U.S. 51 (1988). The single justice found that even if this claim were not waived for his failure to raise it on direct appeal, it must fail because the loss of the clothing had no impact and mere speculation that the blood on the clothes would have produced exculpatory evidence through DNA testing was not sufficient to justify a motion for new trial (S.A. 8, p. 7).

This holding is not contrary to *Brady*, in which the Supreme Court held that suppression by the prosecution of evidence favorable to an accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87. The gatekeeper's decision was not contrary to this rule, where it weighed whether the evidence was material to the petitioner's guilt and determined that it was not.

The Supreme Court later expanded on the *Brady* precedent in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not

constitute a denial of due process of law." *See also Illinois v. Fisher*, 124 S.Ct. 1200, 1202 (2004). The *Youngblood* decision also does not demand a contrary result where the gatekeeper did not find, and the petitioner does not assert, that the Commonwealth acted in bad faith in losing the victims clothing prior to the third trial. *(*S.A. 8, pp. 6-7).

Nor was the gatekeeper's decision an unreasonable application of *Brady* and *Youngblood*. Her alternative assessment of the merits of the claim, in which she found that testing of the clothing would not have proven to be exculpatory was not objectively unreasonable. The petitioner had access to the victim's clothing for several years prior to the third trial. Moreover, his speculation that DNA testing of the blood on the clothing would be exculpatory is not borne out by the record, since the victim had bloody mucous in her mouth and the blood more than likely came from her (Tr. IV/98, 107) (S.A. 8, p. 7). Habeas relief must be denied on this claim.

## CONCLUSION

For all the foregoing reasons, the respondent respectfully requests that the petition for a writ of habeas corpus be denied.

Respectfully submitted,
THOMAS F. REILLY
Attorney General


/s Susanne G. Reardon
Susanne G. Reardon, BBO # 561669
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Date: September 16, 2004          Boston, Massachusetts 02108
(617) 727-2200, ext. 2832

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the petitioner's counsel, on September 16, 2004, by depositing the copy in the office depository for collection and delivery by first-class mail, postage pre-paid, to her as follows:

Kathleen McCarthy
160 State Street, 8th Floor
Boston, MA 02109

/s Susanne G. Reardon
Susanne Reardon