UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS ROSA, JR.,
    Petitioner

v.                                                  Civil Action No. 04-10174-NG

MICHAEL T. MALONEY
    Respondent

    Now comes the Petitioner in the above-captioned case and submits the following brief in response to the Respondent's memorandum. The Petitioner incorporates this brief into his previously filed documents.

### PETITIONER'S SUPPLEMENTAL BRIEF IN RESPONSE TO RESPONDENT'S MEMORANDUM IN OPPOSITION TO THE PETITION FOR WRIT OF HABEAS CORPUS

    Rosa's claims have been "exhausted" for habeas purposes despite the fact that it has never been presented to the full bench. The exhaustion requirement does not require that the SJC have addressed or decided Rosa's federal claim; rather, it requires only that Rosa have presented the substance of that claim to the highest available state court "so that the state had the first chance to correct the claimed constitutional error." *See Hall* v. *DiPaolo*, 986 F.2d 7, 11 (1st Cir. 1993), quoting *Lanigan* v. *Maloney*, 853 F.2d 40, 42 (1st Cir. 1988). Here, Rosa expressly presented all of his claims to the superior court and to the SJC single justice, whose determination was final and unreviewable by the full court.

1

I.   **IF THE COURT HOLDS THAT THE PETITIONER'S CLAIMS ARE PROCEDURALLY BARRED THIS COURT MUST STILL CONSIDER THE MERITS OF THE PETITIONER'S CLAIMS SINCE THERE IS "CAUSE" AND "PREJUDICE" FROM THE PROCEDURAL DEFAULT AND A MISCARRIAGE OF JUSTICE WILL RESULT IF THE CLAIMS ARE NOT ENTERTAINED**

In this case, the Single Justice did not cite or any federal or state authority in support of the denial of the petitioner's request for leave to appeal the denial of his motion for a new trial. However, if the Court determines that the Single Justice based her decision on adequate and independent state-law grounds the Court must still consider the merits of the Petitioner's claim since there is "cause" and "prejudice" from the procedural default and a miscarriage of justice will result if the claims are not entertained. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

**A. Cause**

In order to establish cause the petitioner must demonstrate that some objective factor external to the defense impeded defense counsel's efforts to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). A showing that the factual or legal basis for the claim was not reasonably available to counsel or that interference by officials occurred such that compliance with the procedural rule became impracticable would meet the "cause" standard. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Magee v. Harshbarger*, 16 F.3d 469, 471-72 (1st Cir. 1994). The Commonwealth correctly agrees that the petitioner's claim relative to the newly discovered evidence could not have been brought earlier because the DNA technology that was required to test the evidence was not available

until 1996. [R.Br. at p.13].[1] However, the Commonwealth erroneously maintains the Petitioner "has not demonstrated why he could not have raised the claim regarding the loss of potentially exculpatory evidence on direct appeal if he thought that the testing of the evidence would have produced anything helpful to his case" [R.Br. at p. 13]. The Commonwealth also cited the gatekeeper's statement that although the victim's clothing was lost sometime prior to the third trial, . . . the petitioner . . . never made any attempt to conduct any testing of the evidence during the years when the clothing was available to him. [S.A., p.7].

Contrary to these positions, the petitioner consistently advanced that he recognized that that blood group testing was not done on these items up until the time that they were lost. By way of affidavit the prior attorney's explained their reasons [i.e. "causes"] for not testing the items earlier. The attorneys explained that testing for blood group substances only serve to provide general identifying markers and do not provide a positive identification [Tr.IV:83]; [Ex.:2, 3]. Both prior trial attorneys did not request blood group testing due to the large percentage of the population that are part of the same blood groupings [Ex.:2, 3]. Both attorneys maintain that if these items were properly preserved and DNA testing was available at the time of the defendant's trials, they would have requested the testing to eliminate Mr. Rosa as the source of the blood stains on the pants and the sweater [Ex.:2, 3]. Fluorescent STR markers were first described in 1991, and the first multiplex STR kits became available in 1996 [Ex.:1]. These tests were not available at the time of the defendant's trial and appeals. The logic applied to conclude

---

[1] The following abbreviations will be used throughout this memorandum: [Respondent's Brief at Page Number]; [R.Br. at page]; [Petitioner's Previously Submitted Brief]; [P.Br. at Page Number]; [Items in Supplemental Appendix]; [S.A.Section at Page Number]; [Exhibits Previously Submitted]; [Ex:Number]; [Trial Transcript Volume: Page Number]; [Tr.Volume:Page Number].

3

that the petitioner's newly discovered evidence claim could not have been presented earlier must also apply to this issue. Since the necessary testing to provide a positive identification based on the blood found on the pants and the sweater was not available until after 1996 this claim could not have been raised earlier.

### B. Prejudice

It is well settled law that to establish prejudice a petitioner must demonstrate "not merely that the errors at. . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 798, 714 (1st Cir. 1994) citing *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982). For the reasons outlined below and in the Petitioner's previously submitted memorandum the Commonwealth's presentation of false evidence to the jury and the destruction of evidence infected his entire trial with error of constitutional dimensions. Id.

### 1. Stain on Brown Coat

Here, the petitioner's inability to present irrefutable evidence that the stain on the brown coat did not come from Taylor infected his trial with error of constitutional dimensions. Id. This newly discovered evidence demonstrates that the Commonwealth presented false evidence at trial. Petitioner was denied his federal constitutional right to present witnesses in his favor as provided by the Sixth Amendment to the United States Constitution and denied his rights to due process of law as provided by the Fifth and

4

Fourteenth Amendment to the United States Constitution.[2] [P.Br. at pp.9-19]. The single justice erroneously concluded "the Commonwealth's evidence concerning the satin on the petitioner's coat was of marginal, if any, significance." [R. Br. at p. 13].

The United States Supreme Court has consistently held that State factual determinations not fairly supported by the record cannot be conclusive of federal rights. *Townsend v. Sain*, 372 U.S. 293, 316 (1963) citing *Fiske v. Kansas*, 274 U.S. 380 385; *Blackburn v. Alabama*, 361 U.S. 199, 208-209. Where the fundamental liberties of the person are claimed to have been infringed, the Court carefully scrutinize the state-court record. See, *e. g., Blackburn v. Alabama, supra; Moore v. Michigan*, 355 U.S. 155. The duty of the Federal District Court on habeas is no less exacting. *Townsend v. Sain, 372 U.S. 293, 316* (1963). Contrary to the single justice, the evidence concerning the stain was not marginal. [R. Br. at p. 13; S.A. 8, at p.3]. As discussed previously, Commonwealth's emphasis on this evidence is illustrated by the fact that the Commonwealth requested and obtained a search warrant for the coat, conducted blood group testing on the coat, the prosecutor referred to the evidence in the opening, the prosecutor called a witness to testify to the information and argued the evidence during closing argument. Elicited trial testimony that the victim shared the blood type of forty percent of the population does not abolish the Commonwealth's theory at trial that the stain came from Taylor as the post-conviction DNA testing unequivocally establishes. [R. Br. at p. 16; S.A. 8 p.2]. Additionally, the jury asked the following question: "Could you please explain the types of evidence to us, also proof beyond a reasonable doubt, and also, how are we to use the evidence?' [Tr.VI:3]. The judge responded by explaining

---

[2] The defendant refers the Court to a complete discussion of the "prejudice" in the defendant's previously submitted memorandum at pp.9-19. The complete discussion will not be reiterated in this response but counsel will reference certain arguments in the course of this argument.

direct and circumstantial evidence. [Tr.VI:4]. The judge further explained that if a juror saw him pick up a book and walk into his lobby that would be direct evidence. The judge also explained circumstantial evidence as ". . . [evidence] on certain other facts or other circumstances that are so related to each other and to the main fact at issue that upon proof of those other facts or circumstances you may draw an inference the main fact in issue exists." [Tr.VI:5]. The judge used an example of a picture puzzle to illustrate an inference. The judge stated the following:

> Say you have a picture puzzle consisting of a thousand pieces all scattered all over the room and you take the task of taking those little pieces and lay them out on a desk like this and you start putting them together. You wind up with nine hundred and forty pieces and you are missing sixty. You haven't got them all. But you look down at the puzzle and you say, "I don't need those sixty. I know what that whole picture is, even with its missing parts." I draw an inference that this figure here is a nose. . . . You take the ones you've got, and you draw an inference that something else exists. You do it every day." [Tr.VI:6]

The fact that the victim's blood type was shared by forty percent of the population and the stain could have been caused by coughing or sneezing near the coat does not "eradicate" the significance of the evidence that the stains was consistent with coming from Ms. Taylor. With this jury instruction in mind, the statement by the single justice that this evidence was marginal is misplaced since it was presented as a "piece of the puzzle" pointing to Mr. Rosa's guilt. [R. Br. at 13].[3]

The single justice also states that "the Commonwealth's strongest witness [Sharon Areh] . . . testified that the petitioner was not wearing the coat at the time she saw him with the victim on the night of the murder." The single justice denied the petition by improperly concluding that the eyewitness identification was very strong. [S.A. 8 at p. 4].

---

[3] For a complete discussion of the prejudice the Petitioner directs the Court to his previously filed memorandum P.Br at pp. 9-19.

6

Despite this testimony from the Commonwealth's "strongest" witness, two other witnesses testified that the perpetrator wore a brown coat on the night on the incident. For example, Areh claimed to know Mr. Rosa although she had never spoken to him and he had not spoken to her "prior to this night." [Tr.II:174-175]. Areh described that she had been out at a concert that night with a man and the pairs passed each other as she went to her apartment on a cold night. [Tr.II:181]. Areh did not inform the police of her companion's name because she felt that it had "nothing to do with [the case." [Tr.II:198]. According to trial testimony, the only contact Areh had with the Petitioner prior to the night of this incident was passing each other going up and down the stairs. [Tr.II:187]. Areh was not friends with the Petitioner and did not socialize with him. Also, Areh had not seen the Petitioner since the summer [the incident occurred December 7, 1985]. [Tr.II:189]. A close reading of the transcript illustrates that Areh identified Rosa as the perpetrator after observing him on a few brief occasions months before the incident. In her initial description Offley did not mention that the man with Taylor had a moustache. Offley's description changed after she picked out a picture of the Petitioner. Offley, whose testimony improved for the Commonwealth at every hearing, also had a poor opportunity to observe the perpetrator. [P. Br. at pp.11-13].

The significance of the post-conviction results eliminating a piece of the Commonwealth's case and demonstrating that the Commonwealth presented false evidence takes on additional relevance in view of the fact that there were hairs recovered from Taylor's slacks that were dissimilar with coming from the petitioner or Taylor. Additionally, there were hairs on Taylor's bra that were not consistent with coming from the Petitioner or Taylor. [Tr.IV:70-73]. No fibers from the Petitioner's clothes were

7

found on Mr. Taylor's clothing [Tr.IV:74]. There were no pubic hairs of Ms. Taylor on any or the Petitioner's clothing [Tr.IV:76]. [For a complete discussion of this issue see P.Br. at p. 9-19]. Thus, the record does not factually support the findings of the Single Justice in this area. *Townsend v. Sain*, 372 U.S. 293, 316 (1963) citing *Fiske v. Kansas*, 274 U.S. 380 385; *Blackburn v. Alabama*, 361 U.S. 199, 208-209.

**2. Loss/Destruction of Evidence**

The Prosecution and the Single Justice erroneously claims that the "victim's clothing neither strengthened nor weakened the Commonwealth's case on the primary issue of identification. [R.Br. at p.17; S.A. at p. 16]. The fact that there were hairs on items that were dissimilar to the Petitioner and Taylor demonstrates that the fact that the DNA testing on the blood found on the sweater and the pants came from another individual is not speculative. There were several hairs found on Taylor's bra and none were from the Petitioner and only one was consistent with coming from Taylor. [Tr.IV:70-71]. Furthermore, there were head hairs on the slacks that were also dissimilar to coming from Taylor or the Petitioner. [Tr.IV:72-73].[4] According to trial testimony the white slacks and bra were located underneath Taylor's body and the "white ligature" [sweater] was around her neck. [Tr.III:88] [Tr.IV:97]. Contrary to the Single Justice, in view of the fact that the pants had hairs on them that were not from Taylor or the Petitioner, it is not speculative that the blood on the items underneath her body came from another source. [R.Br. at p. 17 citing S.A. 8 at p.7]. Again, the findings of the Single Justice in these areas are not fully supported by the record.

The holding of the Supreme Judicial Court that these items were lost through no fault of either party is factually incorrect. *Commonwealth v. Rosa*, 422 Mass. 18, 22

---

[4] For a complete discussion of the significance of the "hairs" see P. Br. at p. 14.

FN.5. The current record illustrates that on October 9, 1986, the District Attorney's Office "acknowledged receipt" of the trial exhibits, including the white sweater [exhibit #9] and the white pants [exhibit #10]. According to the docket, the Assistant District Attorney, Ronald Moynihan signed the exhibits out from the Clerk's Office. The pants and the sweater were never produced after the representative from the District Attorney's [George Gushue] acknowledge receipt of them on October 17, 1989 [Ex.:5]. Thus, the loss of these items is clearly attributable to the District Attorney's Office. [For a complete discussion on this issue see P. Br. at pp. 20-26]. For all of the above stated reasons, the petitioner's trial was infected with errors of constitutional dimensions. *Ortiz v. DuBois*, 19 F.3d 798, 714 (1st Cir. 1994) citing *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982).

## II.   MISCARRIAGE OF JUSTICE/ACTUAL INNOCENCE

If the Court finds that the Petitioner has failed to demonstrate cause and prejudice, his claim must still be considered since failure to entertain these claims would result in a miscarriage of justice.[5] *Ortiz v. DuBois*, 19 F.3d at 714 quoting *Murray v. Carrier*, 477 U.s. at 495-496. See, *Sawyer v. Whitley*, 505 U.S. 333, 339, 340 (1992). It is settled law that this exception is reserved for those rare cases in which the conviction of a petitioner who may be actually innocent of the charges will occur if a constitutional error is not redressed. *Schlup v. Delo*, 513 U.S. 298, 321 (1995). The Court has explicitly tied the miscarriage of justice exception to the petitioner's innocence. Id. Since the Petitioner claims that his convictions were obtained in violation of his federal rights to present witnesses in his favor as provided by the sixth amendment to the United

---

[5] The Petitioner is not conceding that he has not demonstrated "cause" and "prejudice" but makes this argument if the Court finds otherwise.

9

States Constitution and in violation of his rights to a fair trial and in violation of his rights to due process of law as provided by the fifth and fourteenth the appropriate standard to apply is that the "petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Murray v. Carrier*, 477 U.s. at 496. [6] To satisfy *Carrier's* "actual innocence" standard, a petitioner must show that, in light of the new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. The focus on actual innocence means that a district court is not bound by the admissibility rules that would govern at trial, but may consider the probative force of relevant evidence that was either wrongly excluded or unavailable at trial. The district court must make a probabilistic determination about what reasonable, properly instructed jurors would do, and it is presumed that a reasonable juror would consider fairly all of the evidence presented and would conscientiously obey the trial court's instructions requiring proof beyond a reasonable doubt. Id. Along these lines, the Petitioner alerts the Court to the fact that he successfully completed a polygraph test despite the fact that it could not be introduced at trial. [S.A., 6 at p.18].

In light of the fact that that post-conviction DNA testing unequivocally determined that one of the Commonwealth's main premises was false, it is more likely than not that no reasonable juror would have found the Petitioner guilty beyond a reasonable doubt. Id. As discussed above, the description of the perpetrator varied from person to person and from hearing to hearing and the physical evidence from the scene

---

[6] The Respondent states that *Burks v. DuBois*, 55 F.3d at 718n.5 left the question of applying the "probability" standard to non-death penalty cases open. However, the Court did apply the "probability" standard in *Burks* which was a trafficking case and not a murder case. Accordingly, in view of the fact that this case is a murder case it appears that the "probability" test articulated in *Murray v. Carrier*, 477 U.S. at 496 should apply.

10

[hairs] supports the Petitioner's innocence. [For a complete discussion see P. Br. at pp.9-19].

As discussed in Petitioner's previously submitted brief, in addition to the evidence presented at the third trial, the stain on the coat was also a major piece of evidence during the first two of the defendant's trials. [P.Br. at pp.15-19]. The Court may consider the probative force of relevant evidence that was either wrongly excluded or unavailable at trial. *Murray v. Carrier*, 477 U.s. at 496. The effect of the results on all three trials must be evaluated particularly in view of the fact that the first jury failed to reach a unanimous verdict. For example, during the first trial there was a similar exchange between Bogdan and the prosecutor relative to the significance of the stain on the lapel of the coat. The following exchange occurred between Bogdan and the prosecutor:

> **Prosecutor:** And, at some time, Sir, were her [victim's] epithelial cells found?
>
> **Bogdan:** The extract of the stain on the right lapel, which was submitted to the medical examiner, and epithelial cells were detected in that extract.
>
> **Prosecutor:** Were you able to group them?
>
> **Bogdan:** A grouping of that extract, which I did, showed the presence of the H blood group substance.
>
> **Prosecutor:** All right. What does the presence of an H blood group substance tell you?
>
> **Bogdan:** It tells me that secretion came from a person who is a secretor Type O, . . .
>
> **Prosecutor:** And, who is the O secretor [sic] in this case?
>
> **Bogdan:** The victim in this case is an O secretor.
>
> **Prosecutor:** So, you are finding an O secretor in the stain **on his coat? (Emphasis added).**

11

**Bogdan**: That is correct.

**Prosecutor:** Do you have an opinion, Mr. Bogdan, whether or not finding the O secretor on the coat is consistent or inconsistent with Gwendolyn Taylor?

**Bogdan:** Is consistent with.

**Prosecutor:** Do you have an opinion whether or not that the group O secretor status on that coat is consistent or inconsistent with the Defendant's blood group typing?

**Bogdan:** That is inconsistent with the Defendant's blood type. [Tr.1:V:65-67].

These findings were re-emphasized in the re-direct examination by the prosecutor:

**Prosecutor:** And, on the stains on the coat, your findings on the groupings of that?

**Bogdan:** I found the H blood group substance consistent with the origin type O secretor.

**Prosecutor:** And, who is the O secretor in this case?

**Bogdan:** Gwendolyn Taylor.

**Prosecutor: And, that is on his coat? (Emphasis added).**

**Bogdan:** Yes.

**Prosecutor:** And, is that consistent with, including her blood grouping on that coat?

**Bogdan:** Yes.

**Prosecutor:** And, is it consistent with excluding his blood grouping on that coat?

**Prosecutor:** Yes. [Tr.1: V: 85-86].

Similarly, during the second trial, the stain on the lapel of the brown coat was emphasized during the prosecutor's opening, witness testimony (Stanley Bogdan testified to fact that the stain was consistent with coming from the victim and inconsistent with

12

coming from the defendant)[Tr.: 2:III: 162-163] and the prosecutor strenuously argued the significance of the stain in his closing argument.

For example, during his opening statement the prosecutor stated the following:

> **Prosecutor:** " . . . Mr. Stanley Bogdan, . . . will tell you about certain tests that he did on that jacket, . . . . and he will tell you about certain tests he did no the defendant's jacket and he found what's known as epithelial cells. And, epithelial cells, that's a fancy way of talking about sweat glands, in a person's mouth and saliva, and he found saliva, or epithelial cells on the defendant's jacket and he did blood grouping tests on that and he will tell you that the blood and saliva on his jacket is not his and it's consistent with being her's. It excludes him and it is consistent with her. So, the chemical information in this case which ties the person and ***the blood grouping of the victim to the defendant is very important in the Commonwealth's case***, . . ."[Tr.2:II:38-39] (emphasis added).

During re-direct examination the following exchange occurred between the prosecutor and Mr. Bogdan:

> **Prosecutor:** Mr. Bogdan, . . . . . sir, assume the following facts, if Gwendolyn Taylor's body was found with a large amount of mucus in her mouth, if she was lifted up and carried by a person wearing that jacket, do you have an opinion as to whether or not that would explain characteristics of her groupings in that stain on his jacket?
>
> **Mr. Bogdan:** Yes.
>
> **Prosecutor:** . . . . And, what is your opinion?
>
> **Mr. Bogdan:** That the stain could have come from her under the way you've described it. [Tr.2:III:178].

During the prosecutor's closing argument in the second trial the prosecutor argued the following:

". . . And on the jacket, as a result of the epithelial cells, they found on his jacket blood groupings which was consistent with her, to the exclusion of him." [Tr.2:V:73].

The prosecutor further argued the following relative to how the stain got on the brown coat:

> ". . . . Isn't it consistent that after she was murdered and after she was raped she was carried down the alleyway and put in that car? And isn't that when he lifted her over his shoulder wearing that coat, that's when the epithelial cells, which match her and don't match him, ended up on his coat?" [Tr.2:V:75].

At the conclusion of his statement the prosecutor argued significance of the coat again by stating:

> ". . . And then again, look what the crime lab does with the coat. They found on the stains consistency with her status as the O secretor and it excludes him as a B secretor on his coat . . . ." [Tr.2:V:80].

Thus, similar to the third trial, if the post-conviction DNA testing was available eliminating Taylor as the source of the stain a major component of the Commonwealth's case would have been eliminated. In view of the fact that the first trial ended in a hung jury and the evidence was used in all three trials, the Court must look at the results of the newly discovered DNA evidence as it effects the outcome of all three trials.

In addition to establishing "actual innocence" the discussion below illustrates that independent constitutional violations which occurred at the trial that probably resulted in his conviction and the granting of the writ of habeas is justified. *Schlup v. Delo*, 513 U.S. 298, 321-327 (1995); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### III. THE PETITIONER'S CLAIMS ARE COGNIZABLE ON HABEAS REVIEW

The Petitioner's claim relative to "newly discovered evidence" is appropriately presented as a violation of his federal rights to present witnesses in his favor, a violation of his rights to a fair trial and a violation of his right to due process of law as provided by the federal constitution. [P.Br. at p. 5]. The Respondent's reliance on *Herrera* to conclude that the "Petitioner's claim are not cognizable on habeas review" is misplaced. [R.Br. at p.17-18]; *Herrera v. Collins*, 506 U.S. 390, 400 (1993). The Respondent

inappropriately compares this case to the *Herrera* case stating, "This is similar to what the petitioner in *Herrera* did, claiming that since newly discovered evidence showed he was actually innocent, his execution would violate the Eighth Amendment." [R. Br. at p.17]. In *Herrera*, he presented affidavits "tending to show" that his "now dead" brother committed the crime. The Petitioner in *Herrera* and similar cases was not attacking the evidence presented at trial but claiming that new evidence, not presented to the trial jury, showed he was actually innocent. The case at bar is different in that the "newly discovered evidence" unequivocally demonstrates that the prosecution presented false evidence to the jury in securing the conviction. This case is not the "garden variety" newly discovered evidence case. In view of the fact that the Commonwealth presented false evidence to the jury the Petitioner's trial was infected with constitutional error, i.e., the deprivation of his right to present witnesses in his favor [to demonstrate that the Commonwealth's premise that the stain came from Taylor was false], the deprivation of his rights to a fair trial and the deprivation of this rights to due process of the law. Accordingly, the Petitioner's claims are cognizable on habeas corpus review and the holding of *Herrera* does not affect the Petitioner's claims in this area. In addition to demonstrating "actual innocence" the above discussion and the previously filed memorandum of the petitioner demonstrates that that the independent constitutional violations which occurred at the trial probably resulted in his conviction and the granting of the writ of habeas is justified. *Schlup v. Delo*, 513 U.S. 298, 321-327 (1995); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

IV.     **STANDARD OF REVIEW/APPLICABILITY OF 28 U.S.C. § 2254 (d)(1)**

The AEDPA's strict standard of review under section 2254(d) applies only when the state court addressed the federal claim on the merits. *Martinez v. Spencer*, 195 F. Supp. 2d 284, 298 (Mass. 2002) citing *Fortini, III v. Murphy*, 257 F.3d 39, 44 (1st Cir. 2001).[7] In *Martinez*, the Court held that since the SJC did not decide whether petitioner was denied effective assistance of trial counsel under the Sixth Amendment, section 2254(d) review did not apply. In *Fortini* the First Circuit made it abundantly clear that a de novo standard of review applies to habeas petitions where state courts neglect to address a petitioner's federal claims. Here, the Single Justice did not address the petitioner's federal claims on either count. Thus, this Court can review those claims "de novo" at this time. Id., *See also, LaVallee v. Coplan*, 374 F.3d 41 (1st Cir. 2004); *Norton v. Spencer*, 351 F.3d 1, 5 (1st Cir. 2003);[Claims not adjudicated on the merits in the state court proceedings are reviewed "de novo"]; *Horton v. Allen*, 370 F.3d 75, 80 (1st Cir. 2004) [If the petition presents a federal claim that was raised before the state court but was left unresolved, the AEDPA's strict standards do not apply]. Because the Single Justice determined both claims on state grounds both issues should be reviewed de novo. See, *DiBenedetto v. Hall*, 272 F. 3d 1, 7 (1st Cir. 2001).[8]

Relative to the Petitioner's newly discovered evidence claim, the Single Justice did not decide whether the Petitioner's convictions were obtained in violation of his federal right to present witnesses in his favor as provided by the Sixth Amendment to the

---

[7] Under the AEDPA, a federal court may grant a habeas petition if it finds that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal Law." 28 U.S..C. § 2254 (d) (1).

[8] The fact that the Respondent claims that the decision of the Gatekeeper was independent of federal law supports the Petitioner's claim that the Petitioner's Federal Constitutional claims have not been addressed and the strict constraints of 28 U.S.C. § 2254 (d)(1) do not apply. [R.Br. at p. 8-12].

United States Constitution and in violation of his rights to a fair trial and due process. The petitioner has established that he is actually innocent and that his federal constitutional claims [violation of right to present witnesses in his favor and violation of his right to a fair trial and due process] were violated. Thus, applying the standard articulated in *Schulp* and *Whitley* the petitioner is entitled to habeas relief. [See brief at pp. 3-14]. Additionally, despite the fact that the it appears that the First Circuit has no applicable precedent regarding the handling of post-conviction newly discovered DNA evidence, applying the traditional standard articulated in *Wright* and it's progeny the petitioners is also entitled to habeas relief. *U.S. v. Bigneau*, 337 F.3d 62, (1st Cir. 2003) citing *United States v. Wright*, 625 F. 2d 1017, 1019 (1st Cir. 1980); *United States v. Colon-Munoz*, 318 F.3d 348, 358 (1st Cir. 2003). [A motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant]. For a complete analysis of this standard the Petitioner refers the Court to P.Br at pp.5-19.

Additionally, contrary to the Respondent's position, the determination of the Single Justice on the second claim is also entitled to "de novo" review.[9] See, *DiBenedetto v. Hall*, 272 F. 3d 1 (1st Cir. 2001) [Faced with state court opinions that do not discuss constitutional claims raised by the defendant, the *Fortini* approach requires that federal courts apply de novo review to the federal constitutional claims raised in

---

[9] The Superior Court Judge did not make any findings relative to this specific claim and endorsed the margin of the petitioner's motion as follows: "After review of the defendants and Commonwealth's memorandum the motion for a new trial is denied without a hearing." [S.A. at 7 p.11].

17

habeas petitions]. In *DiBenedetto*, the court analyzed a similar claim that exculpatory evidence was destroyed prior to trial. *DiBenedetto v. Hall*, 272 F. 3d 1, 11 (1st Cir. 2001). The Court explained that the destruction of potentially exculpatory evidence, is controlled by clearly established federal law, set forth by the Supreme Court in *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984). In *Youngblood*, the Supreme Court held that the police's failure to preserve potentially exculpatory semen evidence in a rape case was not a due process violation unless the police had acted in bad faith. 488 U.S. at 337-38. Nonetheless, simple good faith is not a complete exoneration. See, *United States v. Alston*, 112 F.3d 32, 35 (1st Cir. 1997) ("We are not prepared to say that the government's `good faith' is always and everywhere a complete defense to a due process claim where the government deliberately alters evidence that might otherwise have exculpated the defendant."). Here, as discussed above, the holding of the Supreme Judicial Court that these items were lost through no fault of either party is factually incorrect. *Commonwealth v. Rosa*, 422 Mass. 18, 22 FN.5. The current record demonstrates that the loss of these items is clearly attributable to the District Attorney's Office. It appears that the District Attorney's Office deliberately took the items and lost them. [For a complete discussion on this issue see Argument I at pp. 8-9; P. Br. at pp.20-26].

As discussed previously, prior counsel did not request any testing on the items because testing for blood group substances only serve to provide general identifying markers and do not provide a positive identification [Tr.IV:83; Ex.:2, 3; P. Br. at pp.24-25]. The testing that Petitioner would have done on the evidence was not available at any of the Petitioner's prior trials or appeal.

18

The fact that the items preliminarily tested positive for the presence of blood coupled with the fact that there were hairs not from either party found on pants and a bra recovered from underneath Taylor illustrates that the exculpatory value that was apparent before the evidence was destroyed. *California v. Trombetta*, 476 U.s. 479, 489 (1984); *DiBenedetto v. Hall*, 272 F.3d 1, 13 (1st Cir. 2001).[10]  In view of the fact that these were the only areas that blood was detected the Petitioner would be unable to obtain comparable evidence by other reasonably available means. Id. The loss of these items by the District Attorney's Office deprived the Petitioner of the opportunity to conduct testing that might otherwise have exculpated him. *United States v. Alston*, 112 F.3d 32, 35 (1st Cir. 1997). It would be exculpatory if testing established that the Petitioner was not the source of the blood on the pants or ligature. Accordingly, the Petitioner is entitled to habeas relief.

---

[10] For a complete analysis of applying this standard to this case the Petitioner refers the Court to the Petitioner's Brief at pp.20-26.

## **CONCLUSION**

The Petitioner incorporates by reference his previously filed memorandum of law and for those reasons and all of the reasons outlined above respectfully requests that the Court grant this petition.

THOMAS ROSA
By his attorney,

_____
Kathleen M. McCarthy
160 State Street, 8th Floor
Boston, MA 02108
(978) 975-8060
B.B.O. #550624